**Connell Foley LLP**
One Newark Center
1085 Raymond Boulevard, 19th Floor
Newark, New Jersey 07102
(973) 436-5800
Attorneys for Plaintiff, Super 8 Worldwide, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SUPER 8 WORLDWIDE, INC., a South Dakota Corporation, | Civil Action No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| MAHARAJ BAPA, LLC, a Nebraska Limited Liability Company; KETAN CHAUDHARI, an individual; and RASHMI SAMANI, an individual, | |
| Defendants. | |

Plaintiff Super 8 Worldwide, Inc. by its attorneys, Connell Foley LLP, complaining of defendants, Maharaj Bapa, LLC, Ketan Chaudhari, and Rashmi Samani (collectively, "Defendants"), says:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Super 8 Worldwide, Inc. ("SWI") is a corporation organized and existing under the laws of the State of South Dakota, with its principal place of business in Parsippany, New Jersey.

2.     Defendant Maharaj Bapa, LLC ("Maharaj Bapa"), on information and belief, is a limited liability company organized and existing under the laws of the State of Nebraska, with its principal place of business at 2427 N. 187th Ave, Elkhorn, Nebraska 68022.

3.      Defendant Ketan Chaudhari ("Chaudhari"), on information and belief, is a member of Maharaj Bapa and a citizen of the State of Nebraska, having an address at 2427 N. 187th Ave, Elkhorn, Nebraska 68022.

4.      Defendant Rashmi Samani ("Samani"), on information and belief, is a member of Maharaj Bapa and a citizen of the State of Nebraska, having an address at 2427 N. 187th Ave, Elkhorn, Nebraska 68022.

5.      Upon information and belief, Chaudhari and Samani are the only constituent members of Maharaj Bapa.

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and all defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

7.      This Court has personal jurisdiction over Maharaj Bapa by virtue of, among other things, section 17.6.3 of the June 26, 2019 franchise agreement by and between Maharaj Bapa and SWI (the "Franchise Agreement"), described in more detail below, pursuant to which Maharaj Bapa has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

8.      This Court has personal jurisdiction over Chaudhari and Samani by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which Chaudhari and Samani acknowledged that each were personally bound by section 17 of the Franchise Agreement.

2

9.    Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by Maharaj Bapa of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

10.    On or about June 26, 2019, SWI entered into the Franchise Agreement with Maharaj Bapa for the operation of a 54-room Super 8® guest lodging facility located at 9305 South 145th Street, Omaha, Nebraska 68138, designated as Site No. 54314-14882-02 (the "Facility"). A true copy of the Franchise Agreement is attached hereto as Exhibit A.

11.    On or about June 20, 2024, SWI and Maharaj Bapa entered into a Master Technology Subscription Agreement (the "MITA"), which governed Maharaj Bapa's access, use and display of certain technology services, software, and products provided by SWI or SWI's authorized third-party product or service providers. A true copy of the MITA is attached hereto as Exhibit B.

12.    Pursuant to section 5 of the Franchise Agreement, Maharaj Bapa was obligated to operate a Super 8® guest lodging facility for a twenty‑year term.

13.    Pursuant to section 7, section 18.2, and Schedule C of the Franchise Agreement, and section 4 and related schedules of the MITA, Maharaj Bapa was required to make certain periodic payments to SWI for royalties, system assessment fees, MITA fees, taxes, interest, and other fees (collectively, "Recurring Fees").

14.    Pursuant to section 7.3 of the Franchise Agreement, Maharaj Bapa agreed that interest is payable "on any past due amount payable to [SWI] under this [Franchise] Agreement at

the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

15.    Pursuant to section 3.6.4 of the Franchise Agreement, Maharaj Bapa was required to prepare and submit monthly reports to SWI disclosing, among other things, the amount of gross room revenue earned by Maharaj Bapa at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to SWI.

16.    Pursuant to section 3.6 of the Franchise Agreement, Maharaj Bapa agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Maharaj Bapa agreed to allow SWI to examine, audit, and make copies of the entries in these books, records, and accounts.

17.    Pursuant to section 3.2 of the Franchise Agreement, Maharaj Bapa was required to operate the Facility in compliance with SWI's "System Standards," as defined in the Franchise Agreement, including SWI's operational requirements.

18.    Pursuant to section 3.11 of the Franchise Agreement, Maharaj Bapa agreed that it would not permit or allow its officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to SWI's goodwill or public image.

19.    Pursuant to section 11.2 of the Franchise Agreement, SWI could terminate the Franchise Agreement, with notice to Maharaj Bapa, for various reasons, including Maharaj Bapa's: (a) acting in any way that could be injurious or prejudicial to the goodwill associated with the Super 8® Marks and/or (b) failure to maintain or operate the Facility in a manner that promotes the health or safety of SWI's guests.

16758947-1

20.    Pursuant to section 12.1 of the Franchise Agreement, Maharaj Bapa agreed that, in the event of a termination of the Franchise Agreement pursuant to section 11.2, it would pay liquidated damages to SWI in accordance with a formula specified in the Franchise Agreement.

21.    Pursuant to section 17.4 of the Franchise Agreement, Maharaj Bapa agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

22.    Effective as of the date of the Franchise Agreement, Chaudhari and Samani provided SWI with a Guaranty of Maharaj Bapa's obligations under the Franchise Agreement. A true copy of the Guaranty is attached hereto as <u>Exhibit C</u>.

23.    Pursuant to the terms of the Guaranty, Chaudhari and Samani agreed, among other things, that upon a default under the Franchise Agreement, each would "immediately make each payment and perform or cause [Maharaj Bapa] to perform, each unpaid or unperformed obligation of [Maharaj Bapa] under the [Franchise] Agreement."

24.    Pursuant to the terms of the Guaranty, Chaudhari and Samani agreed to pay the costs, including reasonable attorneys' fees, incurred by SWI in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

**<u>The Defendants' Defaults and the Premature Termination of the Franchise Agreement</u>**

25.    Maharaj Bapa failed to meet its operational and goodwill obligations under the Franchise Agreement.

26.    On or about January 8, 2025, several employees of Defendants' nearby AmericInn® guest lodging facility were arrested on human trafficking charges.

27.     By letter dated January 21, 2025, a true copy of which is attached hereto as <u>Exhibit D</u>, SWI advised Maharaj Bapa that: (a) it was in breach of its obligation under the Franchise Agreement to uphold the goodwill and public image of the Super 8® brand  because the arrests made at Defendants' AmericInn® facility impacted the Facility's goodwill, (b) it had thirty (30) days within which to cure this operational default, and (c) if the default was not cured, then the Franchise Agreement might be subject to termination.

28.     By letter dated March 20, 2025, a true copy of which is attached as <u>Exhibit E</u>, SWI terminated the Franchise Agreement, effective March 20, 2025, due to Defendants' continuing operational and goodwill defaults under the Franchise Agreement.  SWI advised Defendants that they were required to pay to SWI as liquidated damages for premature termination the sum of $108,000.00, as required under section 12.1 of the Franchise Agreement, and all outstanding Recurring Fees through the date of termination.

29.     SWI has satisfied all of its obligations under the Franchise Agreement, SynXis Agreement, and MITA, including without limitation, providing Maharaj Bapa the right to use the Super 8® trade name, trademarks, and service marks.

## FIRST COUNT

30.     SWI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 29 of the Complaint.

31.     Pursuant to sections 3.6 and 4.8 of the Franchise Agreement, Maharaj Bapa agreed to allow SWI to examine, audit, and make copies of Maharaj Bapa's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

32.     The calculation of the monetary amounts sought by SWI in this action is based on the gross room revenue information supplied to SWI by Maharaj Bapa and, to the extent there has been non-reporting, SWI's estimate as to the gross room revenue earned by Maharaj Bapa.

33.     The accuracy of this estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements, and books from Maharaj Bapa.

**WHEREFORE**, SWI demands judgment ordering that Maharaj Bapa account to SWI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the date of termination of the Franchise Agreement.

<u>**SECOND COUNT**</u>

34.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 33 of the Complaint.

35.     On March 20, 2025, SWI terminated the Franchise Agreement due to Maharaj Bapa's failure to cure its operational and goodwill defaults.

36.     Section 12.1 of the Franchise Agreement provides that, in the event of termination of the Franchise Agreement due to the action of the Franchisee, Maharaj Bapa shall pay liquidated damages to SWI within thirty (30) days of termination.

37.     As a result of the termination of the Franchise Agreement, Maharaj Bapa is obligated to pay SWI liquidated damages in the amount of $108,000.00, as calculated pursuant to section 12.1 of the Franchise Agreement.

38.     Notwithstanding SWI's demand for payment, Maharaj Bapa has failed to pay SWI the liquidated damages as required in section 12.1 of the Franchise Agreement.

39.     SWI has been damaged by Maharaj Bapa's failure to pay liquidated damages.

**WHEREFORE**, SWI demands judgment against Maharaj Bapa for liquidated damages in the amount of $108,000.00, together with interest, attorneys' fees, and costs of suit.

## THIRD COUNT

40.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 39 of the Complaint.

41.     By virtue of the premature termination of the Franchise Agreement, SWI sustained a loss of future revenue over the remainder of the twenty-year term of the Franchise Agreement.

42.     If the Court determines that Maharaj Bapa is not liable to pay SWI liquidated damages as required by section 12.1 of the Franchise Agreement then, in the alternative, Maharaj Bapa is liable to SWI for actual damages for the premature termination of the Franchise Agreement.

43.     SWI has been damaged by Maharaj Bapa's breach of their obligation to operate a Super 8® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, SWI demands judgment against Maharaj Bapa for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

44.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 43 of the Complaint.

45.     Pursuant to section 7, section 18.2, and Schedule C of the Franchise Agreement, and section 4 and related schedules of the MITA, Maharaj Bapa was obligated to remit Recurring Fees to SWI.

46.     Despite its obligation to do so, Maharaj Bapa failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement and MITA in the current amount of $10,934.12.

47.     Maharaj Bapa's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and MITA and has damaged SWI.

**WHEREFORE**, SWI demands judgment against Maharaj Bapa for the outstanding Recurring Fees due and owing under the Franchise Agreement and MITA in the current amount of $10,934.12, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

48.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 47 of the Complaint.

49.     Maharaj Bapa utilized SWI's services, trade names, trademarks, and service marks to earn revenue at the facility.

50.     Maharaj Bapa did not adequately compensate SWI for the use of its services, trade names, trademarks, and service marks to earn revenue at the Facility.

51.     Maharaj Bapa's failure to compensate SWI constitutes unjust enrichment and has damaged SWI.

**WHEREFORE**, SWI demands judgment against Maharaj Bapa in an amount equal to the value of the services provided by SWI, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

52.     SWI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 51 of the Complaint.

53.     Pursuant to the terms of the Guaranty, Chaudhari and Samani agreed, among other things, that upon a default under the Franchise Agreement, each would immediately make each payment and perform each obligation required of Maharaj Bapa under the Franchise Agreement.

16758947-1

54.     Despite their obligation to do so, Chaudhari and Samani have failed to make any payments or perform or cause Maharaj Bapa to perform each obligation required under the Franchise Agreement.

55.     Pursuant to the Guaranty, Chaudhari and Samani are liable to SWI for Maharaj Bapa's liquidated damages in the amount of $108,000.00, or actual damages in an amount to be determined at trial, and Maharaj Bapa's outstanding Recurring Fees due and owing under the Franchise Agreement and MITA, in the current amount of $10,934.12.

**WHEREFORE**, SWI demands judgment against Chaudhari and Samani for damages in the amount of all liquidated damages, or actual damages, and outstanding Recurring Fees due and owing under the Franchise Agreement and MITA, together with interest, attorneys' fees, and costs of suit.

**Connell Foley LLP**
Attorneys for Plaintiff,
Super 8 Worldwide, Inc.


By: */s/ Bryan P. Couch*
        Bryan P. Couch

Dated: July 25, 2025

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

I certify that, to the best of my knowledge, this matter is not the subject of any other action

pending in any court or of any pending arbitration or administrative proceeding.

**Connell Foley LLP**
Attorneys for Plaintiff,
Super 8 Worldwide, Inc.


By: */s/ Bryan P. Couch*
Bryan P. Couch

Dated: July 25, 2025

16758947-1

# EXHIBIT A

Location  Omaha, NE
Entity No  14882-02
Unit No  54314

## SUPER 8 WORLDWIDE, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated June 26 , 20 19 , is between SUPER 8 WORLDWIDE, INC , a South Dakota corporation ("we", "our" or "us"), and MAHARAJ BAPA, LLC, a Nebraska limited liability company ("you")  The definitions of capitalized terms are found in Appendix A  In consideration of the following mutual promises, the parties agree as follows

**1. Franchise.** We have the exclusive right to franchise to you the distinctive "Super 8" System for providing transient guest lodging services  We grant to you and you accept the Franchise, effective and beginning on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination  The Franchise is effective only at the Location and may not be transferred or relocated  You will call the Facility a "Super 8" or a "Super 8 by Wyndham" and you may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion  You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term

**2. Protected Territory.** We will not own, operate, lease, manage, franchise or license anyone but you to operate a Chain Facility of the same name (Super 8) in the "Protected Territory", as defined below, while this Agreement is in effect  We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you  We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory  While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility  You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities  This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located with the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminated or is not renewed  You acknowledge that the Protected Territory fairly represents the Facility's trading area and that there are no express or implied territorial rights or agreements between the parties except as stated in this Section  You irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the

1

proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance  You further acknowledge and agree that notwithstanding the foregoing, we may operate, lease, manage, or license any other party to operate a Chain Facility in the Protected Territory beginning (a) six months prior to the expiration of this Agreement, or (b) as of the date that a date for the premature termination of this Agreement has been confirmed in writing by us  The covenants in this Section are mutually dependent, if you breach this Section, your Protected Territory will be the Location only  The Protected Territory means an area to include a three (3) mile radius from the front door of the Facility

### 3.  Your Improvement and Operating Obligations.

3 1 **Pre-Opening Improvements.**  You must select, acquire, construct and/or renovate the Facility as provided in Schedule D

3 2 **Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other related services of the Facility (including those specified on Schedule B) to the public in compliance with all federal, state and local laws, regulations and ordinances as well as System Standards  You will not operate a Food and Beverage service without our prior written consent, except for a complimentary coffee service/continental breakfast in accordance with System Standards  If you do not manage the Chain Facility personally, you must employ a full-time general manager who will be dedicated solely to the Facility  You will keep the Facility in a clean, neat, and sanitary condition  You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards  The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual  The Facility will follow standard industry practices for safeguarding cardholder information, applicable laws and regulations, and such other requirements as we may include in the System Standards Manual or as we may otherwise communicate from time to time for such purpose  You may add to or discontinue the amenities, services and facilities described in Schedule B, or to lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay  Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility  You acknowledge that any breach of System Standards for the Facility, its guest amenities, and your guest service performance is a material breach of this Agreement  Upon our reasonable request, you will provide us with then-current copies of the documents evidencing your ownership of, or right to possess, the Facility and/or the real property upon which the Facility is located, and a complete and accurate list of all of your owners and their Equity Interests

3 3 **Training.**  You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4 1 we designate as mandatory for franchisees and general managers, respectively  You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement  You will pay all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4 1,

2

DocuSign Envelope ID 69BDC82A-1F74-41C6-AADE-87ABEF82FC2B

and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility

### 3 4 **Marketing.**

3 4 1    You will participate in System marketing programs, including the Directory, if any, the Reservation System, and guest loyalty programs   You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants   You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards   You may implement, at your option and expense, your own local advertising Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication   You will stop using any non-conforming, out-dated or misleading advertising materials if we so request

3 4 2    You will participate in any regional marketing, training or management alliance or cooperative of Chain franchisees formed to serve the Chain Facilities in your area   We may assist the cooperative with collecting contributions   You may be excluded from cooperative programs and benefits if you do not participate in all cooperative programs according to their terms, including making payments and contributions when due

3 4 3    The Facility must participate in all mandatory Internet and distribution marketing activities and programs in accordance with the System Standards Manual, including any arrangements with third party distribution channels   You must provide us with information about the Facility and use our approved photographer for taking photographs of the Facility for posting on the Chain Websites, third party travel websites and various marketing media   The content you provide us or use yourself for any Internet or distribution marketing activities must be true, correct and accurate, and you will promptly notify us in writing, in accordance with our processes that are then in effect, when any correction to the content becomes necessary   You must promptly modify, at our request, the content of any Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards You will discontinue any Internet or distribution marketing activities that conflicts, in our reasonable discretion, with Chain-wide Internet or distribution marketing activities   You must honor the terms of any participation agreement you sign for Internet or distribution marketing activities   You will pay when due any fees, commissions, charges and reimbursements relating to Internet or distribution marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis   We may suspend the Facility's participation in Internet and/or distribution marketing activity if you default under this Agreement

3 4 4    You will participate in the Wyndham Rewards program or any successor guest rewards or loyalty program we determine is appropriate and pay the Loyalty Program Charge associated with the program as set forth in Schedule C   The Wyndham Rewards Front Desk Guide sets forth additional standards, which you agree to follow   The Front Desk Guide, including fees assessed and reimbursements rates, may be revised by us or our affiliates at any time upon thirty (30) days' prior notice

3

3 4 5    As a requirement of your participation in the Reservation System, you must participate in our Signature Reservation Services ("SRS") program during the Term of the Agreement  Under the SRS program, you will pay the fees associated with certain reservations answered by our agents on behalf of the Facility  The program terms and fees associated with the program are described in the SRS agreement that you will sign and deliver to us at the same time as you sign this Agreement

3 5 **Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote  You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings  You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224

3 6 **Financial Books & Records; Audits.**

3 6 1    The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards  You acknowledge that your accurate accounting for and reporting of Gross Room Revenue is a material obligation you accept under this Agreement

3 6 2    Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards  We may notify you of a date on which we propose to audit the Facility's books and records at the Facility but such notice is not required  You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date  You need to inform us where the books and records will be produced  You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility  We may require access to the property including guest rooms  We may also perform an audit of the Facility's books and records remotely or electronically without advance notice or your knowledge    Your staff must cooperate with and assist our auditors to perform any audit we conduct

3 6 3    We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3 6 2 within 30 days after the date of the initial audit, (ii) you cancel two (2) or more previously scheduled audits, (iii) you refuse to admit our auditors during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and

4

records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenue for any fiscal year preceding the audit  Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3 6, an "Accounting Procedure Notice "  The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenue you reported to us during the fiscal year fairly present the Gross Room Revenue of the Facility computed in accordance with this Agreement for the fiscal year  You must also pay any deficiency in Recurring Fees, any Audit Fee, as defined in Section 4 8, we assess you for your default of Section 3 6 as described in Section 4 8, and/or other charges we identify and invoice as a result of the audit

3 6 4   You will, at your expense, prepare and submit to us by the third day of each month, a statement in the form prescribed by us, accurately reflecting for the immediately preceding month all Gross Room Revenue and such other data or information as we may require  You must submit your statements to us using our on-line reporting and payment tool or through such other technology or means as we may establish from time to time

3 7 **Inspections.**  You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement  You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice  The inspections will commence during normal business hours although we may observe Facility operation at any time  You and the Facility staff will cooperate with the representative performing the inspection  If the Facility fails an inspection, you refuse to cooperate with our representative, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manual plus the reasonable travel, lodging and meal costs our representative incurs for a reinspection  You will also be charged the Reinspection Fee if we are required to return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Schedule D  We may also include the results of paper and electronic customer satisfaction surveys of your guests as well as unsolicited feedback received from your guests in your final quality assurance score  We may publish and disclose the results of quality assurance inspections and guest surveys  We may, at our discretion, implement a chain-wide quality assurance/mystery shopper inspection program to be performed by a reputable third party  You must provide free lodging for the inspector(s) when he/she visits your Facility

3 8 **Insurance.**  You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual  Unless we instruct you otherwise, your liability insurance policies will name as additional insureds Super 8 Worldwide, Inc , Wyndham Hotels & Resorts, Inc , Wyndham Hotel Group, LLC, and their current and former subsidiaries, affiliates, successors and assigns as their interest may appear  All policies must be primary and non-contributory with or excess of any insurance coverage that may be available to an additional insured  You must submit to us, annually, a copy of the certificate of or other evidence of renewal or extension of

each such insurance policy as required by the System Standards

3 9 **Conferences.** The Chain conference may be held as part of a Wyndham Hotel Group, LLC multi-brand conference with special sessions and programs for our Chain only, or on a chain-wide or regional basis  You or your representative must attend each Chain conference and pay the Conference Fee we set for Chain franchisees, if and when we determine to hold a Chain conference  Mandatory recurrent training for franchisees and managers described in Section 4 1 4 may be held at conference  If you operate other lodging facilities under the System in addition to the Facility, you must send a different representative to the Chain conference and pay another Conference Fee for each facility  We will charge you and you must pay the Conference Fee even if you do not attend the Chain conference  You will receive reasonable notice of a Chain conference  We will invoice and charge you for the Conference Fee even if you do not attend the Chain Conference

3 10 **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve  You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards

3 11 **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Super 8" or "Super 8 by Wyndham" and its distinguishing characteristics, and the other Marks  You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System  You agree that, in event that you or any of your principals or Guarantors is or is discovered to have been, convicted of a felony or any other offense likely to reflect adversely upon us, the System or the Marks, such conviction is a material, incurable breach of this Section  You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners  You will participate in any Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities  You shall use your best efforts to promote usage of other Chain Facilities by members of the public  Except as provided in the System Standards Manual or if you obtain our prior written consent, which we may withhold in our sole discretion, neither your nor the Facility shall promote or advertise any competing business at the Facility including, but not limited to, any other guest lodging facility, time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, unless we or one of our affiliates franchise, manage or own that business

3 12 **Facility Modifications.** You may not materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) until you receive our prior written consent, which we will not unreasonably withhold or delay  You will pay our Rooms Addition Fee then in effect for each additional guest room you may add to the Facility over 120 rooms before you begin construction of any expansion  If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay  You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards

6

3 13    **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives and members of their immediate family, but not more than three (3) standard guest rooms at the same time

3 14    **Minor Renovations.** Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 90 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount  You will perform the Minor Renovations as and when the Minor Renovation Notice requires  We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no less than 80% and the most recent quality assurance inspection score for the Facility was no less than 75% (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation

3 15    **Technology Standards & Communications.** You recognize that the System requires you to acquire, operate and maintain a computer-based property management system and provide guests with innovative technology for communications and entertainment  You must purchase the computer system and other equipment and software that we specify, including preventative maintenance software  We may modify System Standards to require new or updated technology at all Chain Facilities  At our request, you shall participate in any intranet or extranet system developed for use in connection with the System  Such intranet or extranet system may be combined with that of our affiliates  You shall agree to such terms and conditions for the use of such intranet or extranet system as we may prescribe, which may include, among other things (a) confidentiality requirements for materials transmitted via such system, (b) password protocols and other security precautions, (c) grounds and procedures for our suspension or revocation of access to the system by you and others, and (d) a privacy policy governing the parties' access to and use of electronic communications posted on electronic bulletin boards or transmitted via the system  You shall pay any fee imposed from time to time by us or a third party service provider in connection with hosting such system

**4.  Our Operating and Service Obligations.** We will provide you with the following services and assistance

4 1  **Training.** We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner training, remedial training, re-certification training, and supplemental training

4 1 1    **General Manager Training.** We will offer at our corporate offices or at another location we designate training for your general manager in our Hospitality Management Program  The program will not exceed two weeks in duration and will cover such topics as operating a Chain Facility, marketing and sales, financial management, guest services and people management  We may administer certain diagnostic tests via the Internet to measure the skill set of your general manager and, based in part of his/her score, offer certain Internet-based training as a supplement to the classroom training experience  Your initial general manager (or other representative who

7

exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date  Any replacement general manager must complete the training program to our satisfaction within 90 days after he/she assumes the position  If we do not offer a place in the training program within the above time frame, your replacement general manager must attend the next program held at which we offer a place  Your general manager for the Facility must complete the training even if you employ managers at other Chain Facilities who have already received this training  We charge you tuition for training for your general manager in our Hospitality Management Program which is set forth on Schedule D  If he/she does not attend the training within 90 days after the Opening Date, and for any replacement general manager, you must pay a separate tuition at the rate then in effect for the program when your manager attends the program  If you, or any other employee at the Facility wishes to attend the training with your general manager, you can do so and you must pay the Additional Attendee Fee, currently $1,400, which is payable by the scheduled date for the program and is in addition to the tuition due for your general manager  We may charge you full or discounted tuition for "refresher" training for your general manager or for additional staff members who attend the training program with your general manager  We will charge the then in effect discounted tuition for any additional staff members who attend the training program with your general manager    You must also pay for your, your general manager and/or additional staff member's travel, lodging, meals, incidental expenses, compensation and benefits

4 1 2  **Remedial Training.**  We may require you, your general manager and/or your staff to participate in remedial training if the Facility receives a D or F (or equivalent score) on a quality assurance inspection, a D or F score on quality assurance electronic guest survey (or equivalent evaluation system), or experiences significant complaints to our customer care department, as determined by us in our sole discretion  This training may be offered at our corporate offices, at a regional location, on-line or at the Facility  The training may be in the form of one or more classes held at different times and locations as we may require  You must pay the tuition in effect for this program when it is offered to you  If the training is provided at the Facility, you must provide lodging for our trainers  In addition, if at the time of your quality assurance inspection, you receive (i) a failure rating on guest room cleanliness and (ii) an average quality assurance score of F on cleanliness of guestroom category or cleanliness of bathroom category (based on a minimum of 10 electronic quality assurance guest surveys), then we may require you to take a one day, on-site remedial class on housekeeping within 60 days after the inspection  The tuition for an on-line class is currently $250, but is subject to increase in the future  The fee for an on-site customer experience assessment or training class is currently $1,250, but is subject to increase in the future

4 1 3  **Ongoing Training and Support.**  You must subscribe and pay an annual fee for access to our learning management system, Wyndham University, which includes training via live workshops, e-learning modules, webinars, online courses, videos and other educational resources, accessible by you and your staff via the Internet    All general managers must complete recertification training at such intervals as we may establish in the System Standards Manual  You must pay us the tuition then in effect for the program  We may offer other mandatory or optional training programs for reasonable tuition or without charge  Recertification and other supplemental training may be offered in our corporate offices or other locations or held in conjunction with a Chain lodging conference  You must pay the then current tuition for the training

8

as well as for your representative's travel, lodging, meals, incidental expenses, compensation and benefits while attending the training  We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices  We may also offer Internet-based training via the Chain's intranet website

**4 1 4   No Show and Cancellation Fees.** If you or your general manager, or any other member of your staff you designate, fails to register for a required training program within the required time period, or registers for a training program but fails to attend such program as scheduled without, notifying us in advance, whether such attendance is required or optional, we may charge you a No-Show Fee of up to 100% of the tuition for the program  If you, your general manager or any other member of your staff cancels participation in any training program less than seven (7) days before it is scheduled to be held, we may charge you a Cancellation Fee of up to 50% of the tuition for the program  No-Show and Cancellation Fees are in addition to the tuition you will have to pay at the then offered rate when you or your general manager attends the program  We may assess you additional No-Show or Cancellation Fees for continued failures by you under this Section 4 1

**4 2 Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion  We will use System Assessment Fees as allocated in our discretion from the Advertising and Reservation Fund, for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System  We or our Approved Supplier will provide software maintenance and support for any software we or an Approved Supplier license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us, an affiliate or the supplier, as applicable  During the Term, the Facility will participate in the Reservation System on an exclusive basis, including entering into all related technology agreements and complying with all terms and conditions which we establish from time to time for participation  The Facility may not book any reservations through any other electronic reservation system, booking engine or other technology  You shall own all Guest Information within your possession or any service provider holding such information on your behalf, and we shall own all Guest Information within our possession or any service provider holding such information on our behalf  To the extent that you and we both possess identical Guest Information, your and our respective ownership rights with regard to such Guest Information shall be separate and independent from one another    We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties

**4 3 Marketing**

**4 3 1**   We will use System Assessment Fees, allocated in our discretion from the Advertising and Reservation Fund, to promote public awareness and usage of Chain Facilities by implementing appropriate international, national, regional and local advertising, promotion, publicity, market research, loyalty marketing and other marketing programs, training programs and related activities as we deem appropriate  We will determine in our discretion (i) The nature and type of media placement, (ii) The allocation (if any) among international, national, regional and local markets, and (iii) The nature and type of advertising copy, other materials and

9

programs   System Assessment Fees may reimburse us or an affiliate for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services   We are not obligated to supplement the Advertising and Reservation Fund or to advance funds to pay for System marketing activities   We do not promise that you or the Facility will benefit directly or proportionately from System marketing activities

4 3 2   We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) as we deem appropriate and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs

4 3 3   We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for an additional fee

**4 4 Purchasing and Other Services.**  We may offer optional assistance to you with purchasing items used at or in the Facility   Our affiliates may offer this service on our behalf   We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts   We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards

**4 5 The System**   We will control and establish requirements for all aspects of the System   We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions   We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances   We may, in our discretion, change the designation standards for the Chain and then require that you change the designation of the Facility and related presentation of that designation where it appears   We will not be liable to you for any expenses, losses or damages you may sustain as a result of any Mark addition, modification, substitution or discontinuation

**4 6 Consultations and Standards Compliance.**   We will assist you to understand your obligations under System Standards by telephone, mail, during visits by our employees to the Facility, through the System Standards Manual, at training sessions and during conferences, meetings and visits we conduct   We will provide telephone and mail consultation on matters of Facility operation and marketing through our representatives   We will offer you access to any Internet website we may maintain to provide Chain franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement   We may limit or deny access to any such website while you are in default under this Agreement

**4 7 System Standards Manual and Other Publications.**   We will specify System Standards in the System Standards Manual, policy statements or other publications which we may make available to you via our Chain intranet, in paper copies or through another medium   You will at all times comply with the System Standards   You acknowledge that the System Standards and the System Standards Manual are designed to protect the System and the Marks, and not to control the day-to-day operation of your business   We will provide you with access to the System Standards Manual promptly after we sign this Agreement   We will notify you via our

10

Chain intranet or another medium of any System Standards Manual revisions and/or supplements as and when issued as well as any other publications and policy statements in effect for Chain franchisees from time to time

4 8 **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3 6 We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection We may impose a reinspection fee and will charge you for our costs as provided in Section 3 7 In connection with an audit, you will pay us any understated amount plus interest under Section 3 6 If the understated amount is three percent (3%) or more of the total amount owed during a six month period, you will also pay us an "Audit Fee" equal to the costs and expenses associated with the audit Our inspections are solely for the purposes of checking compliance with System Standards

**5.  Term.** The Term begins on the date that we insert in the preamble of this Agreement after we sign it (the "Effective Date") and expires at the end of the twentieth (20th) Franchise Year NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS  However, if applicable law requires us to offer renewal rights, and you desire to renew this Agreement, then you will apply for a renewal franchise agreement at least six months, but not more than nine months, prior to the expiration date, and subject to such applicable law, you will have to meet our then-current requirements for applicants seeking a franchise agreement, which may include (i) executing our then-current form of license and other agreements, which license and other agreements may contain materially different terms and provisions (such as operating standards and fees) from those contained in this Agreement, (ii) executing a general release of us and our affiliates, in form and substance satisfactory to us, (iii) completing a property improvement plan, and (iv) paying a standard renewal fee, if then applicable

**6.  Application and Initial Fees.** You must pay us a non-refundable Application Fee of $2,500, which shall be applied to your Initial or relicense Fee  If your franchise is for a new construction or conversion Facility, you must pay us an Initial Fee  If you are a transferee of an existing Facility or are renewing an existing franchise, you will pay us a Relicense Fee  The amount of your Initial or Relicense Fee is $25,000 00, $2,500 of which shall be applied from your Application Fee, and the remainder paid when you sign this Agreement and is fully earned when we sign this Agreement

**7.  Recurring Fees, Taxes and Interest.**

7 1 You will pay us certain "Recurring Fees" each month of the Term payable in U S dollars (or such other currency as we may direct if the Facility is outside the United States) The Royalty and System Assessment Fees described in this Section 7 1 are payable three days after the month in which they accrue, without billing or demand Other Recurring Fees are payable at the time set forth in the System Standards  Recurring Fees include the following

7 1 1   A "Royalty" equal to five and five-tenths percent (5 5%) of Gross Room Revenue of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the

Term

7 1 2   A "Sγstem Assessment Fee" as stated in Schedule C to be paid into the Advertising and Reservation Fund, accrues from the Opening Date until the end of the Term, including during reservation suspension periods   We may use the System Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services   You will also pay or reimburse us as described in Schedule C for "Additional Fees" such as commissions we pay to travel and other agents for certain reservation and marketing services to generate reservations at the Facility plus a reasonable service fee, fees levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Chain Websites , and/or other reservation systems, distribution channels and networks, and fees for additional services and programs   We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula   We may change, modify, add or delete the System Assessment Fee and/or Additional Fees in accordance with Schedule C

7 2 "Taxes" are equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees and basic charges by the jurisdictions where the Facility is located, but not including any income tax, franchise or other similar tax for our privilege of doing business in your State   You will pay Taxes directly to us when due

7 3 "Interest" is payable on any past due amount payable to us under this Agreement at the rate of 1 5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid   Interest is payable when you receive our invoice

7 4 If a Transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility

7 5 You will report and pay to us all Recurring Fees and other fees and charges on-line via our self-service Electronic Invoice Presentment and Payment tool ("WynPay") accessible through our Chain intranet   In the WynPay on-line environment, payments can be made either through the electronic check payment channel or the credit card payment channel   We reserve the right to change, from time to time, the technologies or other means for reporting and paying fees to us by amending the System Standards Manual

## 8. Indemnifications.

8 1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual,

12

apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven   You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury   This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property

8 2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee   You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest   We must approve any resolution or course of action in a matter that could directly or indirectly have any effect on parties other than you and the complaining party in the matter, or could serve as a precedent for other matters

8 3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name   You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you   You will cooperate with our defense and resolution of the claim   We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others

## 9.   Your Assignments, Transfers and Conveyances.

9 1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity)   We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you   You may finance the Facility and grant a lien, security interest or encumbrance on it (but not in this Agreement) without notice to us or our consent   If a Transfer is to occur, the transferee or you must comply with Section 9 3   Your Franchise is subject to termination when the Transfer occurs   The Franchise is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility   The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13   You and your owners may, only with our prior written consent and after you comply with Sections 9 3 and 9 6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise   Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers

9 2 **Financing Documents.** Neither you, nor any of your Equity Interest owners, shall represent in

13

any proposed financing arrangement to any proposed lender or participant in a private or public investment offering that we or any of our affiliates are or shall be in any way responsible for your obligations or financial projections, if any, set forth in such financing arrangement or investment offering or that we or any of our affiliates are or shall be participating in such private or public investment offering In addition, any proposed financing arrangement where the service mark "Super 8" appears, or a reference to this Agreement appears, shall contain a disclaimer in bold face type substantially as follows  THE BORROWER IS A PARTY TO AN AGREEMENT WITH SUPER 8 WORLDWIDE, INC TO OPERATE HOTELS USING THE SERVICE MARK "SUPER 8 "  NEITHER SUPER 8 WORLDWIDE, INC NOR ITS AFFILIATES OWN ANY SUCH HOTELS OR ARE A PARTY TO THIS FINANCING AND HAVE NOT PROVIDED OR REVIEWED, AND ARE NOT RESPONSIBLE FOR, ANY DISCLOSURES OR OTHER INFORMATION SET FORTH HEREIN  Also, at least fifteen (15) days prior to closing such financing, you shall submit to us a written statement certifying that you have not misrepresented or overstated your relationship with us and our affiliates or your rights to use the Marks

9 3 **Conditions.** We may condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions, however, we will not unreasonably withhold, delay or condition our consent to a Transfer if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment  If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as we reasonably determine   We will provide a Punch List of improvements we will require after we receive the transferee's Application  We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or in, the alternative, condition our approval of the Transfer on limiting the transferee's term to the balance of your Term, or adding a right to terminate without cause exercisable by either party after a period of time has elapsed  Our consent to the transaction will not be effective until these conditions are satisfied  If we do not approve the Transfer, we may, in our sole discretion, allow you to terminate the Franchise when you sell the Facility and pay us Liquidated Damages under Section 12 1 at the same rate as you would pay if the termination occurred before the Opening Date  Such payment would be due and payable when you transfer possession of the Facility  We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise  Our consent to a transfer is not a waiver of (i) any claims we may have against you, or (ii) our right to demand strict compliance from the Transferee with the terms of its agreement

9 4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee  No Transfer will be deemed to occur  You also must not be in default and you must comply with the application and notice procedures specified in Sections 9 3 and 9 6  Each Permitted Transferee must first agree in writing to be bound by

14

this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees  No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement  You must comply with this Section if you transfer the Facility to a Permitted Transferee  A transfer resulting from a death may occur even if you are in default under this Agreement

**9 5 Attempted Transfers.**  Any transaction requiring our consent under this Section 9 in which our consent is not first obtained will be void, as between you and us  You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility

**9 6 Notice of Transfers.**  You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction  You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility  We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days  You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner  You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request

**10. Our Assignments.**  We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent  We will have no obligations to you with respect to any assigned right or duty after you are notified that our transferee has assumed such rights or duties under this Agreement except those that arose before we assign this Agreement

**11. Default and Termination.**

**11 1    Default.**  In addition to the matters identified in Sections 3 1 and 3 6, you will be in default under this Agreement if  (a) you do not pay us when a payment is due under this Agreement or under any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement  If your default is not cured within 10 days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11 2  We will not exercise our right to terminate if you have completely cured your default during the time allowed for cure, or until any waiting period required by law has elapsed  In the case of a default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, if you have acted diligently to cure the default but cannot do so, and the default does not relate to health or safety, we may, in our discretion, enter into an improvement agreement with you provided you request such an agreement within 30 days after receiving notice of the failing inspection  If we have entered into an improvement

15

DocuSign Envelope ID 69BDCB2A 1F74-41C6-AADE-87ABEF82FC2B

agreement, you must cure the default within the time period specified in the improvement agreement which shall not exceed 90 days after the failed inspection. We may terminate this Agreement and any or all rights granted hereunder if you do not timely perform that improvement agreement

11 2    **Termination.** We may terminate this Agreement effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11 1 or we are authorized to terminate under Schedule D due to your failure to perform your Improvement Obligation, (2) you discontinue operating the Facility as a "Super 8" or a "Super 8 by Wyndham", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests

11 3    **Casualty and Condemnation.**

11 3 1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as a transient lodging facility after the Casualty

11 3 2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority but you will be liable for the Condemnation Payments set forth in Section 12 2

16

11 3 3  The protected territory covenants will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty

11 4    **Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue reservation referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default  All Reservation System User Fees accrue during the suspension period  Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform  We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Reconnection Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards  We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory  We may also suspend or terminate any temporary or other fee reductions we may have agreed to in this Agreement and/or any stipulations in Section 18 below, and/or cease to provide any operational support until you address any failure to perform under this Agreement  You agree that our exercise of any rights in this Section will not constitute an actual or constructive termination of this Agreement  All such remedies are cumulative and not in lieu of any other rights or remedies we may have under this Agreement  If we exercise our right not to terminate this Agreement but to implement such suspension and/or removal, we reserve the right at any time after the appropriate cure period under the written notice has lapsed, to, upon written notice to you, terminate this Agreement without giving you any additional corrective or cure period (subject to applicable law) You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief, without the need for posting any bond  We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice  Consent or approval may be withheld while you are in default under this Agreement or may be conditioned on the cure of all your defaults  Once a termination or expiration date for this Agreement has been established in accordance with the provisions of this Agreement, we may cease accepting reservations through the Reservation System for any person(s) seeking to make a reservation for a stay on any date including or following the termination or expiration of this Agreement

11 5    **Your Remedies.**

11 5 1  If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation  To the extent permitted by applicable law, this action shall be your exclusive remedy

11 5 2  You (and your owners and guarantors) waive, to the fullest extent permitted by law, any right to, or claim for, any punitive or exemplary damages against us and against any affiliates, owners, employees or agents of us, and agree that in the event of a dispute, you will be limited to

17

the recovery of any actual damages sustained and any equitable relief to which you might be entitled

## 12. Liquidated Damages.

12 1    **Generally.** If we terminate this Agreement under Section 11 2, or you terminate this Agreement (except under Section 11 3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as a Liquidated Damages, an amount equal to the sum of accrued Royalties and System Assessment Fees during the immediately preceding 24 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less)    If the Facility has been open for fewer than 24 months, then the amount shall be the average monthly Royalties and System Assessment Fees since the Opening Date multiplied by 24    You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7 3 accruing from 30 days after the date of termination until the amount is paid    Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms that we authorized you to operate under Schedule B of this Agreement, regardless of any room reduction    If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination, Liquidated Damages equal to one-half the amount payable for termination under Section 11 2    If any valid, applicable law or regulation of a competent governmental authority having jurisdiction over this Agreement limits your ability to pay, and our ability to receive, the Liquidated Damages you are obligated to pay hereunder, you shall be liable to us for any and all damages which we incur, now or in the future, as a result of your breach of this Agreement    Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement    Our right to receive other amounts due under this Agreement is not affected

12 2    **Condemnation Payments.** If a Condemnation occurs, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11 3 2 or until the Condemnation occurs, whichever is longer    If the Condemnation is completed before the one year notice period expires, you will pay us Liquidated Damages equal to the average daily Royalties and System Assessment Fees for the 12 month period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period    This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority)    If the Condemnation is completed after the one year notice period expires you will pay no Liquidated Damages, but the fees set forth in Section 7 must be paid when due until Condemnation is completed

## 13. Your Duties At and After Termination.    When a Termination occurs for any reason whatsoever

13 1    **System Usage Ceases.**    You must comply with the following "de-identification" obligations    You will immediately stop using the System to operate and identify the Facility You will remove all signage bearing any Marks and follow the other steps detailed in the System

SUP
Q1/19

Standards Manual or other brand directives for changing the identification of the Facility    You will promptly paint over or remove distinctive System trade dress, color schemes and architectural features    You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces    You will cease all Internet marketing using any Marks to identify the Facility    If you do not strictly comply with all of the de-identification requirements above, in the System Standards Manual and in our other brand directives, you agree to pay us a royalty equal to $2,000 per day until de-identification is completed to our satisfaction    You will transfer to us any domain names you own that include any material portion of the Marks

13 2    **Other Duties.**  You will pay all amounts owed to us under this Agreement within 10 days after termination    We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11 4    We may notify third parties that the Facility is no longer associated with the Chain    We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours    If you have not completed your de-identification obligations to our satisfaction, we may paint over or remove and purchase for $10 00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination    You will promptly pay or reimburse us for our cost of removing such items, net of the $10 00 purchase price for signage    We will exercise reasonable care in removing or painting over signage    We will have no obligation or liability to restore the Facility to its condition prior to removing the signage    We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you

13 3    **Reservations.**  The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions    You acknowledge and agree that once a termination or expiration date for this Agreement has been established in accordance with the provisions of this Agreement, we may stop accepting reservations through the Reservation System for any person(s) seeking to make a reservation for a stay on any date on or after the termination or expiration of this Agreement    In addition, when this Agreement terminates or expires for any reason, we have the right to contact those individuals or entities who have reserved rooms with you through the CRS to inform them that your lodging facility is no longer part of the System    We further have the right to inform those guests of other facilities within the System that are near your Facility in the event that the guests prefer to change their reservations    You agree that the exercise of our rights under this Section will not constitute an interference with your contractual or business relationship

13 4    **Survival of Certain Provisions.**  Sections 3 6 (as to audits, for 2 years after termination), the first two sentences of 3 11, 7 (as to amounts accruing through termination), 8, 11 3 2, 11 4, 12, 13, 15, 16 and 17 survive termination of this Agreement    Additionally, all covenants, obligations and agreements of yours which by their terms or by implication are to be performed

19

after the termination or expiration of the Term, shall survive such termination or expiration

**14. <u>Your Representations and Warranties</u>.** The parties disclaim making or relying upon any representation, promise, covenant, or warranty, express or implied, oral or written, except as expressly stated in this Agreement  You expressly represent and warrant to us as follows

14 1    **Quiet Enjoyment and Financing.**  You own, or will own prior to commencing improvement, or lease, the Location and the Facility  You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility  You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement

14 2    **This Transaction.**  You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement  You have obtained all necessary approvals of your owners, Board of Directors and lenders  No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement  Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject  Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application  You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement  You represent and warrant to us that the information you provided in your Application is true, correct and accurate  To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U S  Executive Order 13224, in lists published by the U S  Department of the Treasury's Office of Foreign Assets Control, or otherwise

14 3    **No Misrepresentations or Implied Covenants.**  All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances  There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement

**15. <u>Proprietary Rights</u>.**

20

15 1    **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement   You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing  You agree to (i) execute any documents we request to obtain or maintain protection for the Marks, (ii) use the Marks only in connection with the operation of the Facility as permitted by the System Standards, and (iii) that your unauthorized use of the Marks shall constitute both an infringement of our rights and a material breach of your obligations under this Agreement

15 2    **Inurements.**  All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit  No good will shall attach to any secondary designator that you use

15 3    **Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as franchisor or franchisee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks  We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, Approved Supplier lists, franchise sales personnel (or independent franchise sales representatives), etc

15 4    **Confidential Information.**  You will take all appropriate actions to preserve the confidentiality of all Confidential Information  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement   You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software)  You will use Confidential Information only for the Facility and to perform under this Agreement  Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U S  Copyright Act, as amended   Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three (3) years  We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information

21

15 5    **Litigation.** You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware  We alone will handle disputes with third parties concerning use of all or any part of the System  You will cooperate with our efforts to resolve these disputes  We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material

15 6    **The Internet and other Distribution Channels.** You may use the Internet to market the Facility subject to this Agreement and System Standards  You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark except as otherwise expressly permitted by the System Standards Manual or with our written consent  You will assign to us any such identification at our request without compensation or consideration  You may not purchase any key words for paid search or other electronic marketing that utilizes any Mark without our written consent  You must make available through the Reservation System and the Chain Website all rates you offer directly to the general public or indirectly via Internet marketing arrangements with third parties  You agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf or for Chain Facilities to participate in their programs  You must participate in the Chain's best available rate on the Internet guarantee or successor program  The content you provide us or use yourself for any Internet or distribution marketing materials must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary  You shall promptly modify at our request the content of any Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards  Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15 2

## 16. Relationship of Parties.

16 1    **Independence.** You are an independent contractor  You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever  We and you have a business relationship based entirely on and circumscribed by this Agreement  No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement  You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees

16 2    **Joint Status.** If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly  The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities

22

**17. Legal Matters.**

17 1    **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect  If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected  However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party

17 2    **Waivers, Modifications and Approvals.**  If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice  Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel  All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective  We may unilaterally revise Schedule C when this Agreement so permits

17 3    **Notices.**  Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, (iii) by first class, prepaid certified or registered mail, return receipt requested, (iv) by electronic mail, posting of the notice on our Chain intranet site or by a similar technology, or (v) by such other means as to result in actual or constructive receipt by the person or office holder designated below, to the appropriate party at its address stated below or as it may otherwise designated by notice  You consent to receive electronic mail from us  Notices shall be deemed given on the date delivered or date of attempted delivery, if refused

Super 8 Worldwide, Inc
Our address  22 Sylvan Way, Parsippany, New Jersey 07054-0278
Attention  Senior Vice President - Contracts Administration, Fax No  (973) 753-7254
Your name  MAHARAJ BAPA, LLC, Your address  2427 N  187th Ave , Elkhorn, NE 68022,
Attention  Ketan Chaudhan, Your fax No  n/a, Your e-mail address  kenchad@yahoo com

17 4    **Remedies.**  Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity  The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement

17 5    **Miscellaneous.**  This Agreement is exclusively for the benefit of the parties  There are no third party beneficiaries  No agreement between us and anyone else is for your benefit  The section headings in this Agreement are for convenience of reference only

17 6    **Choice of Law; Venue; Dispute Resolution.**

17 6 1  This Agreement will be governed by and construed under the laws of the State of New

23

Jersey, except for its conflicts of law principles  The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey

17 6 2  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives  If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation  Either party may request mediation which shall be conducted by a mutually acceptable and neutral third party organization  If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation

17 6 3  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you

17 6 4  **WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17 6 5  Any judicial proceeding directly or indirectly arising from or relating to this Agreement shall be considered unique as to its facts and may not be brought as a class action  You and each of the owners of your Equity Interests waive any right to proceed against us by way of class action

17 7   **Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

17 7 1  **You have read our disclosure document for prospective franchisees ("FDD") and independently evaluated and investigated the risks of investing in the hotel industry generally and purchasing this franchise specifically, including such factors as current and potential market conditions, owning a franchise and various competitive factors**

17 7 2  **You have received our FDD at least 14 days before signing this Agreement or paying any fee to us.**

17 7 3  **Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement or in the FDD.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement or in the FDD.**

17 7 4  **This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the Franchise other than the representations set forth in the FDD.  Notwithstanding the foregoing, no provision in any**

24

franchise or membership agreement, or any related agreement, is intended to disclaim the express representations made in the FDD.

17 7 5 **You acknowledge that no salesperson has made any promise or provided any information to you about actual or projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the FDD or in a writing that is attached to this Agreement and signed by us.**

17 7 6 **You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

17 8    **Force Majeure.** Neither you nor we shall be liable for loss or damage or deemed to be in breach of this Agreement if the failure to perform obligations results from   (a) windstorms, rains, floods, earthquakes, typhoons, mudslides or other similar natural causes, (b) fires, strikes, embargoes, war, acts of terrorism or riot, (c) legal restrictions that prohibit or prevent performance, or (d) any other similar event or cause beyond the control of the party affected   Any delay resulting from any of such causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, so long as a remedy is continuously and diligently sought by the affected party, except that no such cause shall excuse payment of amounts owed at the time of such occurrence or payment of Recurring Fees and other amounts due to us subsequent to such occurrence other than a governmental or judicial order prohibiting such payments

17 9    **No Right to Offset**   You acknowledge and agree that you will not withhold or offset any liquidated or unliquidated amounts, damages or other monies allegedly due you by us against any Recurring Fees or any other fees due us under this Agreement

18    **Special Stipulations.** The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions   You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and supported by adequate consideration from both parties   These are personal to you and are not transferable or assignable except to a Permitted Transferee

18 1 **Prior Affiliation**   Notwithstanding anything to the contrary, you agree that, prior to the Opening Date, you will provide us with a copy of the written termination notice or other written evidence satisfactory to us in our sole discretion that any prior hotel affiliation has terminated before we will cause the Opening Date to occur   We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if you do not provide satisfactory proof of termination of the prior hotel affiliation prior to the Opening Date   The Opening Date will not occur before July 10, 2019, the date you have indicated is the date you cease operation as part of another hotel chain

18 2    **Combined Fees**   Notwithstanding Section 7 1, you will pay a Combined Fee consisting of the Royalty and System Assessment Fee, at the rates set forth in this Section   The Combined Fee excludes commissions and related service charges, guest complaint assessments, Internet and GDS

25

DocuSign Envelope ID 69BDCB2A-1F74-41C6-AADE-87ABEF82FC2B

Fees, the Loyalty Program Charge and other similar fees and charges described on Schedule C which must be paid as stated in this Agreement

18 2 1  The Combined Fee shall be five and one half percent (5 5%) of Gross Room Revenues accruing during the first through fourth Franchise Years, and

18 2 2  The Combined Fee shall be six and one half percent (6 5%) of Gross Room Revenues accruing during the fifth Franchise Year, and

18 2 3  The Royalty and System Assessment Fees shall be computed and paid at the rates specified in Section 7 1 on Gross Room Revenues accruing after the fifth Franchise Year

18 2 4   The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Royalty and System Assessment Fees shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you either satisfy the Improvement Obligation or fail to complete it by the required deadlines, the Facility receives a quality assurance inspection score of less than 80% (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of more than 80% in a re-inspection to be performed not less than 60 days after the initial inspection

**[Signatures follow on next page]**

SUP
Q1/19

DocuSign Envelope ID 69BDCB2A-1F74-41C6-AADE-87ABEF82FC2B

June    IN WITNESS WHEREOF, the parties have executed this Agreement on this 26 day of _____, 20 19 and agree to be bound by the terms and conditions of this Agreement as of the Effective Date

**WE:**
Super 8 Worldwide, Inc



By _____
    Michael Piccola
    Senior Vice President


**YOU**, as franchisee
**MAHARAJ BAPA, LLC**

By _____
    Managing Member

27

## APPENDIX A

### DEFINITIONS

Additional Fees means the fees charged under Section 7 1 2 other than System Assessment Fee

Agreement means this Franchise Agreement

Application Fee means the fee you pay when you submit your Application under Section 6

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Schedule D

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control

Chain means the network of Chain Facilities

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks

Chain Websites means any current or future consumer or business websites, mobile websites or mobile applications that we or our affiliates develop for booking reservations for and/or providing information about Chain Facilities, and any future equivalent technology

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence    Confidential Information includes all other system standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the property management system software and other applications software

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural,

Appendix A - 28

plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility

Directory means any general purpose directory we issue, whether printed, web-based, or issued in another medium, which may list the names and addresses of Chain Facilities in the United States, and at our discretion, other System facilities located outside the United States, Canada and Mexico

Effective Date means the date we insert in the Preamble of this Agreement after we sign it

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction   Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes  An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner   An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date   An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners   An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the Effective Date

FF&E means furniture, fixtures and equipment

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility

<u>Franchise</u> means the non-exclusive franchise to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1

<u>Franchise Year</u> means

(i) *If the Opening Date occurs on the first day of a month* the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period, or

(ii) *If the Opening Date does not occur on the first day of a month* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period

<u>Gross Room Revenue</u> means gross revenues attributable to or payable for rentals of guest (sleeping) rooms at the Facility, including all credit transactions, whether or not collected, guaranteed no-show revenue, net of chargebacks from credit card issuers, any proceeds from any business interruption or similar insurance applicable to the loss of revenues due to the non-availability of guest rooms and any miscellaneous fees charged to all guests regardless of the accounting treatment of such fees  Excluded from Gross Room Revenues are separate charges to guests for Food and Beverage (including room service),  actual telephone charges for calls made from a guest room, key forfeitures and entertainment (including Internet fees and commissions), vending machine receipts, and federal, state and local sales, occupancy and use taxes  Gross Room Revenue is further described in System Standards

<u>Guest Information means</u> any names, email addresses, phone numbers, mailing addresses and other information about guests and customers of the Facility, including without limitation stay information, that either you or we or a person acting on behalf of you, us, or both you and us, receives from or on behalf of the other or any guest or customer of the Facility or any other third party

<u>Improvement Obligation</u> means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Schedule D

<u>Indemnitees</u> means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities

<u>Initial Fee</u> means the fee you are to pay for signing this Agreement as stated in Section 6 if the Agreement is for a new construction or conversion franchise

<u>Liquidated Damages</u> means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty

<u>Location</u> means the parcel of land situated at <u>9305 S  145th St , Omaha, NE 68138</u>, as more fully

described in Schedule A

Losses and Expenses means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection, and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20 00 on the Effective Date) if the drawee dishonors any check that you submit to us

Loyalty Program Charge means the fee you pay us under Section 3 4 4 and Schedule C for a frequent guest rewards program or other special marketing programs that we may create or undertake and require participation by Chain Facilities

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Super 8 Hotel" and other marks (U S Reg Nos 1,602,723, 3,610,109, 3,610,108, and 5,682,000) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3 14

Minor Renovation Ceiling Amount means $3,000 00 per guest room

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3 16

Loyalty Program Charge means the fee you pay us under Section 3 4 4 and Schedule C for a frequent guest rewards program or other special marketing programs that we may create or undertake and require participation by Chain Facilities

Opening Date has the meaning specified in Schedule D

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other

aspects of lodging operations

<u>Permitted Transferee</u> means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor

<u>Prototype Plans</u> has the meaning specified in Schedule D for New Construction Facilities

<u>Punch List</u> means any list of upgrades and improvements attached as part of Schedule D, which you are required to complete under Section 3 1 and Schedule D

<u>Reconnection Fee</u> means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement or for any other reason, in the amount specified in Schedule C

<u>Recurring Fees</u> means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, and other reservation fees and charges as stated in Section 7

<u>Relicense Fee</u> means the fee your transferee pays to us when a Transfer occurs or the fee you pay to us if you are renewing an existing franchise

<u>Reinspection Fee</u> means the fee you must pay to us under Section 3 7 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards

<u>Reservation System</u> or "Central Reservation System" means the back end technology platform and applications used by us to accept, store and/or communicate reservations for Chain Facilities The Reservation System is separate from, but enables, the booking of reservations for Chain Facilities through various distribution channels such as the Chain Websites, the GDS and other distribution channels

<u>Rooms Addition Fee</u> means the fee we charge you for adding guest rooms to the Facility

<u>Royalty</u> means the monthly fee you pay us for use of the System under Section 7 1 1 "Royalties" means the aggregate of all amounts owed as a Royalty

<u>System</u> means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following  (a) the Marks, (b) other intellectual property, including  Confidential Information, System Standards Manual and know-how, (c) marketing, advertising, publicity and other promotional materials and programs, (d) System Standards, (e) training programs and materials, (f) quality assurance inspection and scoring programs, and (g) the Reservation System

Appendix A - 32

<u>System Assessment Fee</u> means the aggregate of all fees charged under Section 7 1 2 and Schedule C to pay for the cost of the System's marketing, advertising, Reservation System, training and other services

<u>System Standards</u> means the standards for participating in the System published in the System Standards Manual or elsewhere, including but not limited to design standards, FF&E standards, Marks standards, marketing standards, operations standards, technology standards and maintenance standards and any other standards, policies, rules and procedures we promulgate about System operation and usage

<u>System Standards Manual</u> means the Service Delivery & Practices Manual and any other manual or written directive or communication we issue or distribute specifying the System Standards

<u>Taxes</u> means the amounts payable under Section 7 2 of this Agreement

<u>Technology Standards</u> means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities

<u>Term</u> means the period of time during which this Agreement shall be in effect, as stated in Section 5

<u>Termination</u> means a termination of this Agreement

<u>Transfer</u> means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility   A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction

<u>"You" and "Your"</u> means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees

<u>"We", "Our" and "Us"</u> means and refers to Super 8 Worldwide, Inc , a South Dakota corporation, its successors and assigns

Appendix A - 33

DocuSign Envelope ID  69BDCB2A-1F74-41C6-AADE-87ABEF82FC2B

## SCHEDULE A

(Legal Description of Facility)

`

## SCHEDULE B

PART I          YOUR OWNERS

| Name | Ownership Percentage | Type of Equity Interest |
|------|----------------------|-------------------------|
| **Ketan Chaudhari** | **80%** | **Member** |
| **Rashmi Samani** | **20%** | **Member** |

PART II          THE FACILITY

Primary designation of Facility  Super 8 Hotel

Number of approved guest rooms  <u>54</u>


Initial

SUP
Q1/19

# SUPER 8 WORLDWIDE, INC.
## SCHEDULE C
### April 2019

**I.    System Assessment Fee**

The System Assessment Fee is equal to three percent (3%) of Gross Room Revenue, and is paid into the Advertising and Reservation Fund   The System Assessment Fee is a recurring, non-refundable payment   All or any part of Fund proceeds received during an accounting period need not be disbursed within that accounting period   Notwithstanding the above, we may increase the System Assessment Fee you pay upon 60 days advance written notice as part of a Chain-wide increase in System Assessment Fees we implement in our sole discretion to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs

**II.    Additional Fees**

**A    Loyalty Program Fees**

We charge a Loyalty Program Charge for your participation in the Wyndham Rewards or successor guest loyalty program   The Loyalty Program Charge is 5% of any amounts on which members of the Loyalty Program earn points or other program currency at the Facility as defined in the Front Desk Guide or any other program rules, which are System Standards   We will proactively match and award members with points or other program currency they earn at the Facility even if they do not present their Wyndham Rewards membership number upon check-in   You will be billed monthly in arrears for points or other program currency awarded to members during the preceding month   If you do not achieve a certain number of Wyndham Rewards valid enrollments, you must pay us a Retraining Fee of up to $400 per month as described in the Front Desk Guide   If you do not process a member's points in a timely manner and we must resolve the issue with the member, we will charge you a Loyalty Member Services Administration Fee as described in the Front Desk Guide

**B    Customer Care Fee**

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest   We may also contact you, at our discretion, if we become aware of any other complaints about the Facility including complaints which are posted on third-party travel websites, distribution channels, blogs and social networks, or other forums to which you do not respond   If you do not respond to and resolve any complaint to the satisfaction of the guest within three business days after we refer it to you, we will charge you a "Customer Care Fee" of $195 00, plus the costs we incur to settle the matter with the guest   The Customer Care Fee is intended only to reimburse us for the costs of complaint handling and is not intended as penalties or liquidated damages   All guest complaints remain subject to indemnification under this Agreement

C      **Best Rate Guarantee Program**

You must (i) make available through the Central Reservation System and the Chain Websites room rates equivalent to those you offer to the general public directly or indirectly via third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Rate Guarantee Program according to its published requirements  We will also charge you a Processing Fee, currently $60 to reimburse us for our administrative charges of handling the complaint

D      **Reconnection Fee**

If we suspend Central Reservation System service because of your default under this Agreement or for any other reason, then you must pay us the Reconnection Fee set forth in the System Standards Manual before we restore service  Currently, the Reconnection Fee is $4,000

E      **Other Fees, Commissions and Charges**

You will pay us a fee, as applicable, for reservations for your Facility from certain distribution partners processed through various reservation channels  "GDS Fees" are assessed for qualified reservations processed through any global distribution system ("GDS") or through any Internet website or other booking source powered by a GDS  "Internet Booking Fees" are assessed for qualified reservations processed through an Internet website connected through an alternate distribution system  "Third Party Channel Fees" are assessed for qualified reservations coming from our partners directly or indirectly to our distribution platform  We will establish the amount of the GDS, Internet Booking Fees, and Third Party Channel Fees from time to time based on the fees these channels charge us and/or our own costs (including overhead) for providing these services  Some of our distribution partners may charge a commission on reservations you receive through these reservation channels and, if we pay such commission on your behalf, you will reimburse us and pay our service charge of 1 5% of commissionable revenue  Upon written notice to you, we may alter, change, modify, remove or add new fees as existing reservation channels are modified or partners are added to existing channels or new reservation channels are established

You will also pay commissions for (a) reservations booked by "Agents" and/or (b) qualified reservations consumed by members of affinity groups and organizations that participate in our Member Benefits program  You must pay our service charge of 1 5% of commissionable revenue, if applicable  "Agents" include, but are not limited to, travel agents, on-line travel and referral websites, travel consortia, travel management companies, and global sales agents, as well as digital media linking to Chain websites and unique call center numbers purchased by the pay-for-performance program ("PFP")  These commission payments may go to the Agent, affinity group or organization in whole or a portion of the payment may be allocated to various marketing activities and/or to our Global Sales Organization to offset its administrative and overhead costs for supporting the Member Benefit Program and other programs that generate room nights at Chain Facilities, or, in the case of the PFP program, to fund purchases of additional digital media directing consumers to Chain websites and unique call center numbers

DocuSign Envelope ID 69BDCB2A-1F74-41C6-AADE-87ABEF82FC2B

Under our Wyndham Referral Rewards Program, Chain Facilities may receive leads from other Chain Facilities, facilities of our affiliates and employees of our parent company or its predecessor    For this business, we charge you a referral commission of 10% of the Commissionable Revenue on qualifying reservations  When the referring party is a Chain Facility or facility of an affiliate 7% of the referral commission is paid to the referring facility, and when the referring party is an employee of our parent company or its predecessor, 6% of the referral commission is paid to the employee   The remaining 3% and 4%, as applicable, is distributed to our Global Sales Organization to offset its administrative and overhead costs for supporting the Wyndham Referral Rewards Program

We may change, modify or delete Additional Fees for existing services and programs and add new Additional Fees for new services, programs and distribution channels at any time upon not less than thirty (30) days' written notice

Schedule C - 38

## SCHEDULE D
## ADDENDUM FOR CONVERSION FACILITIES

*This Addendum applies if you are converting an existing guest lodging facility to a Chain Facility*

## 1. YOUR IMPROVEMENT OBLIGATION.

**1.1 Generally.** You must select and acquire the Location and acquire, equip and supply the Facility in accordance with this Agreement and System Standards   You must provide us with proof that you own or lease the Facility by the earlier to occur of (a) 30 days after the Effective Date or (b) the Opening Date   You must maintain control of the Facility consistent with such documentation during the Term   You must begin renovation of the Facility no later than 30 days after the Effective Date   Time is of the essence for the completion of the Improvement Obligation   We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation   The grant of an extension will not waive any other default existing at the time the extension is granted   All renovations must comply with System Standards, any Approved Plans, this Agreement and the Punch List   Your general contractor or you must carry the insurance required under this Agreement during renovation

**1.2 Pre-Opening Improvements** You must complete all renovations specified as "prior to opening" on the Punch List before we consider the Facility to be ready to open under the System The deadline for completing the pre-opening phase of conversion and the renovations shall be as specified on any Punch List attached to this Agreement, but is otherwise 90 days from the Effective Date   You must continue renovation and improvement of the Facility after the Opening Date if the Punch List so requires   We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the pre-opening improvements of the Facility by the dates specified on the Punch List or otherwise and you fail to do so within five days after we send you written notice of default, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System in violation of this Schedule and you fail to cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default   If we choose to grant an extension of any deadline, including the Facility's Opening Date, you will pay us a non-refundable extension fee of $5,000   This fee will be payable to us within ten (10) days of the Opening Date   You must also pay us the Reinspection Fee described in Section 3 7 if you fail to complete the Improvement Obligation by the deadline established in the Punch List or otherwise and our representatives must return to the Facility to inspect it   In limited circumstances, you may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval   If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Section 11, you will begin paying the Royalty to us, as specified in Section 7 1, from the date you identify or operate the Facility using the Mark   We may delay the Opening Date until you pay the Royalty accruing under this Section

Schedule D Conversion - 39

### 1.3 Improvement Plans.

(a) <u>Prototype Plans Renovation</u> If the Punch List requires you to renovate the Facility in accordance with our Prototype Plans (or you elect to receive the Prototype Plans), you will be required to electronically designate an architect who must electronically accept the Prototype Plans Agreement  Within 15 days after we electronically receive the signed Prototype Plans Agreement, we will deliver to your architect a complete set of our Prototype Plans  Your architect and you will create construction documents (including a project manual and working drawings) for renovation of the Facility based upon the Prototype Plans, System Standards and this Agreement so that it conforms as closely as possible to the Prototype Plans and System Standards, and then submit them for our approval before starting demolition and improvement of the Location

(b) <u>Generally</u>  You will create plans and specifications for the work described in Section 1 1 of this Schedule D (based upon System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location  We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like, who must exercise their own independent professional care, skill and diligence in the design and renovation of your Facility  Our review does not cover technical, architectural or engineering factors relating to the existing structure at the Location, the validity of conversion given the existing structure, or compliance with federal, state or local laws, regulations or code requirements, for which your architect is responsible  You must allow for 10 days of our review each time you submit Plans to us  We will not be liable to your lenders, contractors, employees, guests, others, or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after the renovation  Any material variation from the Approved Plans requires our prior written approval Approved Plans must incorporate design elements as set forth in System Standards  You may purchase furniture, fixtures, equipment and other supplies that you may need during renovation of the Facility through our affiliate, Worldwide Sourcing Solutions, Inc 's "Approved Supplier" program  If you choose to purchase certain design items from a supplier other than an Approved Supplier, we may charge you a Custom Interior Design Review Fee, currently $6,000  This fee will be assessed for our review of custom interior design drawings which you must submit to us to ensure compliance with our interior design standards     We may offer other optional architectural and design services for a separate fee  You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request

(c) <u>Deviation from Approved Plans</u>  We may inspect the work while in progress without prior notice  We may direct you to change the work in progress if it deviates from the Approved Plans or System Standards and may terminate this Agreement if you fail to comply with any such direction  If you encounter unexpected issues with demolition, renovation, reconstruction or refurbishment of the existing structure which make continuation of the project using the Approved Plans commercially infeasible, you must notify us immediately and provide a complete written report on the matter, including any proposal to modify the Approved Plans you believe is appropriate together with your estimate of the projected costs of meeting the Approved

Schedule D Conversion - 40

Plans  We will evaluate the report, your proposal and the situation and respond within 30 days to any request to vary the Approved Plans, or provide suggestions for resolving the issues in such a manner as will be acceptable to us  Neither party shall terminate this Agreement unless and until such notice is given and the 30 day period shall have elapsed without agreement on modifying the Approved Plans  If either party then decides to terminate this Agreement, you will pay, if then not paid, and we will retain, the full Initial Fee as Liquidated Damages

## 2. ONBOARDING AND MANDATORY SERVICES AND FEES

**2.1 Onboarding Services**  We will provide full operational resources, including training and support, for property opening  We will provide training through various on-line courses on subjects such as quality assurance, housekeeping, preventative maintenance, customer service, and the RFP process  A member of our field team will also assist with property operations topics including Systems Standards and use of the Chain's intranet site  These onboarding services are provided as part of the Initial Fee required in Section 6

**2.2 Mandatory Support Services and Fees.**  We will arrange for delivery of an initial supply of key property supplies that assist the Facility with meeting System Standards and/or participating in key marketing initiatives as reasonably determined by us  You will pay $500 for your initial supplies  We will arrange to have our preferred photography provider take digital photographs of the in accordance with System Standards for use on our Chain Websites, third party travel websites and various marketing media and such photographs will be owned by us  You will pay $2,450 for the required photo package  If we allow you to open the Facility before your installation of permanent signage, we will arrange for one of our Approved Suppliers to provide temporary exterior signage for the Facility in the form of a Mark-bearing bag to cover your existing primary free standing sign  You will pay $1,000 for this temporary signage  If you install permanent signage from an Approved Supplier for the Facility on or before the Opening Date, or if within thirty (30) days of the Opening Date you sign a quote and pay the required deposit for permanent signage from the vendor assigned to provide temporary signage for the Facility, then we shall issue you a credit of $1,000  We will provide training for your general manager as set forth in Section 4 1 of the Agreement if he/she attends the training by the deadline set forth in Section 4 1   The tuition for this mandatory training program is currently $2,000

## 3. DEFINITIONS.

<u>Opening Date</u> means the date on which we authorize you to open the Facility for business identified by the Marks and using the System

<u>Prototype Plans</u> means the prototype documents reflecting the overall design intent, FF&E, and color schemes for a Chain Facility that we deliver to you after the Effective Date

<u>Prototype Plans Agreement</u> means the agreement that your designated architect will execute in order to receive a copy of the Prototype Plans

Schedule D Conversion - 41

DocuSign Envelope ID  69BDCB2A-1F74-41C6-AADE-87ABEF82FC2B

## SCHEDULE D
## ADDENDUM FOR CONVERSION FACILITIES


**[Punch List Attached]**

SUP
Q1/19

## GUARANTY

To induce Super 8 Worldwide, Inc., its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement   Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee   We waive notice of amendment of the Agreement   We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement

GUARANTORS

*Ketankumar Chaudhari*

Name  Ketan Chaudhari
Address  24287 N  187th Ave , Elkhorn, NE 68022

*Rashmi Samani*

Name  Rashmi Samani
Address  24287 N  187th Ave , Elkhorn, NE 68022

# EXHIBIT B

Location: **Omaha, NE**

Unit No.: **54314-14882-02-SUP**

**SCHEDULE**
**TO**
**MASTER INFORMATION TECHNOLOGY AGREEMENT**

**SYNXIS PROPERTY MANAGEMENT SYSTEM**

This Schedule ("**Schedule**"), effective as of <u>Jun 20, 2024</u> ("**Schedule Effective Date**"), by and **Super 8 Worldwide, Inc., a South Dakota corporation** including its Affiliates ("**Service Provider**," "**we**," "**our**," or "**us**"), and **Maharaj Bapa, LLC**, a Super 8® by Wyndham ("**you**" or "**your**") is issued pursuant to and incorporates by reference the terms and conditions of the Master Information Technology Agreement, dated as of <u>Jun 20, 2024</u>, entered into by and between us and you ("**Agreement**") for a Super 8® by Wyndham® Facility.  We and you shall each be referred to herein as a "**Party**" and together as the "**Parties**" to this Schedule.

1. **GENERAL**

   1.1    **Definitions.** Capitalized terms used in this Schedule shall have the meanings ascribed to them in this Schedule or the Agreement, as applicable, which may be updated or supplemented by us from time to time. All other capitalized terms used but not defined herein shall have the meanings ascribed to them in the Franchise or Membership Agreement and are incorporated herein by reference.

   1.2    **Conflicts in Interpretation.** The following order of precedence shall be followed in resolving any inconsistencies between the terms of this Agreement and the terms of any Attachments attached hereto: (a) first, the terms contained in this Schedule; and (b) second, the terms of the Agreement, provided that no order of precedence shall be applied among any such Schedules.

   1.3    **Overview**.  The purpose of this Schedule is for us to provide you certain Products and/or Services concerning the SynXis Property Management System or in connection with the SynXis Property Management System.

2. **DESCRIPTION OF PRODUCTS AND/OR SERVICES**

   2.1    **Authorization**.  Pursuant to the terms and conditions set forth in the Agreement and this Schedule, you authorize us to provide to you the Products and/or Services that are described in this Schedule and we agree to provide you with the Products and/or Services that are described in this Schedule.

   2.2    **The SaaS Solution.** The "**SaaS Solution**" means the computer program, applications, features and services expressly identified on <u>Attachment 2.2</u> and any and all modifications, corrections, updates and enhancements to such SaaS Solution, including any we may from time to time make available to you. The SaaS Solution does not include any Non-SaaS Solution Services as specified in Section 7.  For purposes of clarity, the SaaS Solution shall be considered Products and/or Services as such term is used in the Agreement.

1

**2.3     Elavon Hosting Services.** In order to access and use the SaaS Solution pursuant to this Agreement, on or before ten (10) days following the Effective Date, you shall execute that certain Hosted Services Agreement for Hosted Gateway Services directly with Elavon Inc., or a substantially similar agreement with an alternate vendor designated by us ("**Elavon Agreement**"). The Elavon Agreement exclusively covers the offering provided thereunder (the "**Elavon Non-SaaS Solution Services**").

**2.4     Implementation Services**. On a date after which you have signed both the Elavon Agreement and this Agreement, we shall use reasonable efforts to implement the SaaS Solution as described in Attachment 2.4 attached hereto (the "**Implementation Services**") and you shall follow all of our instructions for preparing the Facility, at your sole expense, for implementation of the SaaS Solution.  The SaaS Solution  shall be deemed accepted by you ("**Acceptance**") immediately upon implementation of the SaaS Solution by us (the "**Acceptance Date**").

**2.5     Rate and Inventory Consulting Services.** From time to time, we may provide services to you under our Central Rate and Inventory Support Program (the "**CRISP Services**") consistent with Attachment 2.5 attached hereto, which may be updated or supplemented by us from time to time.

**2.6     Maintenance and Support Services.** Subject to you performing all of your Responsibilities identified in this Schedule and Attachment 2.6 ("**Your Responsibilities**"), we shall provide maintenance and support services as set forth on Attachment 2.6 attached hereto ("**Maintenance and Support Services**").

**2.7     Additional Services.**  We may perform additional Services agreed to in writing by you and us from time to time, which may include additional fees to be agreed to by you and us.

**3.     GRANT OF RIGHTS**

**3.1     License.** Subject to payment of all applicable Fees, we hereby grant to you the right to access, use and display the use the Products and/or Services, including the SaaS Solution during the Term solely for the Permitted Use, solely by your Permitted Users and solely in accordance with the terms and conditions set forth in the Agreement and this Schedule.  Except for the limited right expressly granted by  foregoing, all rights, title and interests in and to the Products and/or Services, including the SaaS Solution, are reserved to us or to any Third Party who licenses the Products and/or Services to us or to our  Affiliates.

**3.2     Our Responsibilities.**  We shall: (a) use commercially reasonable efforts to make the SaaS Solution available twenty-four (24) hours a day, seven (7) days a week, except for: (i) planned downtime, or (ii) any unavailability caused by circumstances beyond our reasonable control, including without limitation, acts of nature, acts of government, floods, fires, earthquakes, civil unrest, acts of terror, labor strikes, Internet service provider failures or delays, or denial of service attacks; and (b) provide the SaaS Solution only in accordance with applicable laws and government regulations that govern the implementation of the SaaS Solution.

**3.3     Your Responsibilities**. You shall: (a) be fully responsible for your Permitted Users' compliance with the Agreement and this Schedule, as applicable; (b) be responsible for the accuracy, quality and legality of Guest Information, to the extent collected by you or your employees, agents or representatives, and for the means by which you or your employees, agents or representatives acquire Guest Information; (c) prevent unauthorized access to or use of the SaaS Solution, and notify us promptly of any such unauthorized access or use; and (d) use the SaaS Solution only in accordance

with the Agreement, this Schedule, and applicable laws and government regulations. You shall not: (i) make the SaaS Solution available to anyone other than your Permitted Users; (ii) sell, resell, rent or lease the SaaS Solution; (iii) use the SaaS Solution to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of the privacy rights of any Third Party; (iv) use the SaaS Solution to store or transmit software viruses, malicious code or other harmful files; (v) interfere with or disrupt the integrity or performance of the SaaS Solution or the data of any Third Party contained therein; or (vi) attempt to gain unauthorized access to the SaaS Solution or any related networks.

    **3.3.1    RevIQ System Use Restrictions.** In addition to your responsibilities and/or restrictions set forth in the Agreement, your and your Permitted Users' access and/or use of the RevIQ Products and/or Services is also subject to the RevIQ System Use Restrictions set forth in Attachment 3.2 (the "**RevIQ System Use Restrictions**"), and you and your Permitted Users agree to comply with and be bound by such RevIQ System Use Restrictions at all times while accessing or otherwise using the RevIQ Products and/or Services.  Any breach by you or your Permitted Users shall be considered a material breach of the Agreement and/or this Schedule.

## 4.    FEES AND PAYMENTS

**4.1    Fees.** You shall pay all fee amounts specified in Attachment 4.1 to this Schedule for the SaaS Solution and the Products and/or Services set forth in this Schedule ("**Fees**"), beginning on the Acceptance Date through the duration of the Term. If your franchise or membership involves the transfer of an existing Chain Facility to Franchisee or Member or changing affiliation of the Facility from one Wyndham Hotels & Resorts, Inc.-owned franchise or member system to another, you will be charged a transfer fee ("**Transfer Fee**").  You will also pay for all Additional Services, as applicable.

**4.2    Invoicing and Payments.** Invoicing from us to you for the Product and/or Services under this Schedule shall be in accordance with the Agreement.  Payments from you to us for the Product and/or Services under this Schedule shall be in accordance with the Agreement.

## 5.    TECHNICAL SPECIFICATION REQUIREMENTS

**5.1    Minimum Technical Requirements.** To access and use the SaaS Solution, you must use Hardware and subscribe to Communication Services that meet our technical specification requirements set forth on Attachment 5.1.

## 6.    WARRANTY; SUPPORT; DISCLAIMER

**6.1    General.** We warrant that following the Acceptance Date and for a period of sixty (60) days thereafter, the SaaS Solution will perform the functions and operations in a good workmanlike manner provided that you: (a) follow our instructions, updates and modifications; (b) makes corrections, as directed; (c) pays all applicable Fees when due; and (d) is not otherwise in default under this Agreement or the Franchise or Membership Agreement. Our sole obligation under this warranty shall be to use reasonable efforts to remedy any nonperformance of the SaaS Solution within a reasonable time after you report such nonperformance to us.

**6.2    Intellectual Property.** We have the right to provide you with the rights granted hereunder, and, to the best of our knowledge, the SaaS Solution does not infringe any Intellectual Property rights of any Third Party.

SynXis Schedule to MITA
Q1/2024

**6.3    Support.** We or our Affiliates will provide a toll-free telephone number for reporting any nonperformance of the SaaS Solution, and we or our Affiliates will use reasonable efforts to diagnose and remedy such nonperformance within a reasonable time after you report such nonperformance to us. You must perform all user- required maintenance specified by the vendor of any Hardware or Communication Services, and obtain required maintenance only from an authorized service provider.

**6.4    DISCLAIMER**. THE WARRANTIES AND REMEDIES DESCRIBED IN THIS SECTION 6 ARE EXCLUSIVE AND ARE IN LIEU OF ALL OTHER EXPRESS AND IMPLIED WARRANTIES AND REMEDIES FOR THIS SERVICE. THE ABOVE WARRANTIES SHALL BE RENDERED NULL AND VOID IF THE SAAS SOLUTION IS SUBJECTED TO ABUSE, MISUSE, IMPROPER INSTALLATION AT THE FACILITY OR MAINTENANCE BY UNAUTHORIZED SERVICE PERSONNEL, OR IF THE SAAS SOLUTION IS ALTERED WITHOUT OUR EXPRESS CONSENT OR DIRECTION, OR USED FOR A PURPOSE NOT AUTHORIZED UNDER THE AGREEMENT OR THIS SCHEDULE, OR IF THE SAAS SOLUTION IS DAMAGED OR DESTROYED DUE TO ACTS OF NATURE, WAR, TERRORISM, CIVIL UNREST, FIRES, NATURAL DISASTERS, OR OTHER EVENTS BEYOND OUR CONTROL. EXCEPT AS PROVIDED IN THIS SECTION 6, **OR EXCEPT WHERE SUCH WARRANTIES OR REPRESENTATIONS ARE REQUIRED TO BE GIVEN OR MADE BY APPLICABLE LAW, (A) WE MAKE NO WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY ABOUT THE PRODUCTS AND/OR SERVICES, THEIR MERCHANTABILITY, THEIR FITNESS FOR ANY PARTICULAR PURPOSE, NON-INFRINGEMENT, OR THEIR CONFORMANCE TO THE PROVISIONS AND SPECIFICATIONS OF ANY ORDER OR DOCUMENTATION; (B) WE MAKE NO REPRESENTATION OR WARRANTY REGARDING THE VOLUME OF RESERVATIONS OR AMOUNT OF REVENUES THAT YOU MAY ATTAIN THROUGH THE USE OF THE PRODUCTS AND/OR SERVICES, OR THAT YOUR RESERVATIONS OR REVENUE WILL INCREASE; (C) WE MAKE NO REPRESENTATION OR WARRANTY THAT THE PRODUCTS AND/OR SERVICES WILL (I) MEET YOUR OR ANY OTHER PERSON'S OR ENTITY'S REQUIREMENTS, (II) OPERATE WITHOUT INTERRUPTION, (III) ACHIEVE ANY INTENDED RESULT, (IV) BE ERROR FREE, OR (V) BE COMPATIBLE, WORK WITH OR CONTINUE TO WORK WITH ANY OF YOUR SYSTEMS OR COMPONENTS, AND THE PRODUCTS AND/OR SERVICES ARE PROVIDED ON AN "AS IS," "WHERE IS," AND "AS AVAILABLE" BASIS; AND (D) WE MAKE NO REPRESENTATION OR WARRANTY REGARDING ANY OF THE DATA THAT YOU MAINTAIN OR THE PREVENTION OF ANY VIRUSES OR MALWARE, AND WE ARE NOT RESPONSIBLE FOR THE LOSS OF ANY DATA OR THE INTRODUCTION OF ANY VIRUSES OR MALWARE, EVEN IF SUCH LOSS OR INTRODUCTION RESULTS FROM OUR PERFORMANCE OF SERVICES HEREUNDER. YOU ARE RESPONSIBLE FOR ENSURING THAT YOUR DATA IS ADEQUATELY BACKED UP AND THAT YOU MAINTAIN CURRENT UPDATED ANTI-VIRUS/ANTI-MALWARE SOFTWARE. YOU, ON BEHALF OF YOURSELF, YOUR SUCCESSORS AND ASSIGNS, HEREBY WAIVE, RELEASE AND RENOUNCE ALL CLAIMS OR CAUSES OF ACTION THAT YOU MAY HAVE AGAINST US, OUR AFFILIATES, OR OUR OR THEIR OFFICERS,**

**DIRECTORS OR AGENTS, ARISING OUT OF THE PRODUCTS AND/OR SERVICES, UNLESS DUE TO OUR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.**

7.  **INDEMNIFICATION**

    **7.1**    **Indemnification**. In addition to your indemnification obligations set forth in the Agreement, you  agree that our third-party vendor, IDeaS, shall be a third-party beneficiary of this Schedule and you shall be responsible to, and shall indemnify and hold harmless, both us and IDeaS, for any liability or damage incurred or arising from or related to use of the RevIQ Products and/or Services by you or your Permitted Users in a manner that violates the RevIQ System Use Restrictions.

8.  **TERM AND TERMINATION**

    **8.1**    **Term.**  This Schedule shall be effective as of the Schedule Effective Date and shall continue in full force and effect until termination of the Franchise or Membership Agreement, unless earlier terminated in accordance with the terms and conditions of this Schedule ("**Term**").

    **8.2**    **Termination**.   This Schedule may be terminated only in accordance with the Agreement.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties hereto have executed, or caused to be executed by their duly authorized representatives, this Schedule as of the Schedule Effective Date.

\*By signing this Schedule, you represent that you are authorized to enter into this Schedule on behalf of the Franchisee or Member.

**We: Super 8 Worldwide, Inc.**

                      **You: Maharaj Bapa, LLC**

By: _____

Janesh Patel

Senior Vice President

Global Contact Centers and Franchise System Support

                      By: _____

                      Name: Ketan B. Chaudhari

                      Title: Managing Member

**Our address:**
**22 Sylvan Way**
**Parsippany, NJ 07054, USA**

                      **Your address:**
                      **9305 South 145th Street Omaha, NE 68138**

6

SCHEDULE
TO
MASTER INFORMATION TECHNOLOGY AGREEMENT

SYNXIS PROPERTY MANAGEMENT SYSTEM

<u>**ATTACHMENT 2.2 – SynXis Property Hub**</u>

**The SaaS Solution**

The SaaS Solution means the SynXis Property Management System, which as of the Schedule Effective Date includes the following features and functionality:

- Cloud-based solution
- Community model hosting by Sabre Hospitality Solutions, or an affiliate thereof
- We may also provide an interface with an automated rate audit system.
- In-system training materials

**RevIQ Standard**

RevIQ Standard is the current rate audit system that offers, among other things, the following features and functionality:

- A daily optimization, which generates optimal base-price decisions and hotel-level last room value ("**LRV**") for the next 365 days
- Four (4) intra-day optimizations, which generate optimal base-price decisions and hotel-level LRV for the next fourteen (14) days
- A daily 365-day hotel-level occupancy forecast
- Permitted User-configured pricing offsets for all non-base room types
- Automated daily price decision upload for all room types to Sabre Central Reservations System ("**CRS**") and Sabre Opera Cloud after each optimization
- Automated daily hotel-level LRV decision upload to Sabre CRS and Sabre Opera Cloud after each optimization
- Permitted User-defined "Special Events" configuration
- Permitted User-defined "Pricing Seasons" configuration
- Permitted User-configured price "floors" and "ceiling" values for base price decisions by pricing season
- Access to RevIQ Standard via both desktop and mobile devices
- Smart alerts functionality for both desktop and mobile devices
- Reporting capability available via desktop
- Competitive set configuration displaying pricing from Permitted User configured hotel competitors via both desktop and mobile devices

**SCHEDULE**
**TO**
**MASTER INFORMATION TECHNOLOGY AGREEMENT**

**SYNXIS PROPERTY MANAGEMENT SYSTEM**

**ATTACHMENT 2.4**
**Implementation Services**

We will offer Implementation Services consisting of assistance in installation/implementation of the SaaS Solution including the following:

- Assistance with setup of two (2) Elavon tokenization terminals (to be provided in connection with execution of Elavon Agreement)

- Installation of SaaS Solution on a minimum of two (2) workstations for Facility's front desk (Hardware to be provided by Franchisee or Member)

- Training modules regarding features and functionality of SaaS Solution, including video demonstrations and tutorials

- Remote and optional on-site resources including training of Facility's staff

8

SCHEDULE
TO
**MASTER INFORMATION TECHNOLOGY AGREEMENT**

**SYNXIS PROPERTY MANAGEMENT SYSTEM**

**ATTACHMENT 2.5**
**CRISP Services**

## Terms of CRISP Services

Franchisee or Member agrees to establish the best available rate "**BAR**"; provided, however that Franchisee or Member acknowledges and agrees that it will retain ultimate control over all rate audit decisions. Subject to the foregoing, Franchisee or Member explicitly authorizes Franchisor to make adjustments to the Facility's rates, inventory and restrictions in order to comply with the Required Policies and Practices without advance notice to Franchisee or Member. Franchisor shall not, however, change the BAR without authorization from Franchisee or Member. In addition, Franchisee or Member may modify or reverse any change Franchisor may make by notifying Franchisor, provided that such modification or reversal is consistent with the Required Policies and Practices. Franchisee or Member's general manager shall be its primary representative who shall have the authority to make rate audit decisions for the Facility, unless Franchisee or Member designates another Facility representative in writing to Franchisor. Franchisor may communicate with Franchisee or Member's representative by telephone, e-mail or in another manner, and Franchisor may rely on any communication which Franchisor believes, in good faith, is from Franchisee or Member's representative. Any know-how, algorithms, formulae, data, recommendations, documentation, software, or other materials or information that Franchisor furnishes to Franchisee or Member in connection with the CRISP Services shall be deemed "Confidential Information" as defined in the Franchise or Membership Agreement and shall be subject to all prohibitions on disclosure, copying or use of Confidential Information under the Franchise or Membership Agreement.

## Overview of CRISP Services

Property Audit & Setup

In consultation with the Facility representative, simplify rates and room type structures by:
- Verifying that all required rate plans are loaded correctly in the SaaS Solution;
- Verifying that local rates are available for sale in the distribution channels selected by the Facility;
- Verifying that all brand standard rate plans are available for sale; and
- Verifying that all hotel specific data is accurate and up to date in all systems.

Rate & Inventory Management

Review inventory/rate visibility and consistency across all distribution channels. Key services include:
- Monitoring Facility inventory and rate settings in the SaaS Solution;
- Identifying and advising Franchisee or Member of erroneous rate plans;
- Monitoring rates across distribution channels and checking for accuracy in third party channels; and
- Coordinating participation in key corporate accounts and marketing programs.

**SCHEDULE
TO
MASTER INFORMATION TECHNOLOGY AGREEMENT**

**SYNXIS PROPERTY MANAGEMENT SYSTEM
ATTACHMENT 2.6**
**Maintenance and Support Services**

**SYNXIS PROPERTY MANAGEMENT SUPPORT:**

First Level of Support

We will provide first-level support for the SaaS Solution, which shall include:
- SynXis Property Management System;
- Upon availability, the automated rate audit solution
- Any additional interfaces included in the SaaS Solution.

Additionally, we shall field initial inquiries related to the Elavon Non-SaaS Solution Services though support therefor shall be provided as set forth in the Elavon Agreement.

Second Level of Support

In the event first level support fails to resolve any maintenance or support issues (e.g. Defects and DCRs) for the SaaS Solution, we will provide second level support by submitting a case with the appropriate Third Party provider of the SaaS Solution, and provide follow-up.

**REVIQ SUPPORT:**

- Providing initialization services in conjunction with our third-partner partners and/or providers.

- Providing first-level support for the RevIQ Products and/or Services, which shall include:

  o Maintaining tracking system for all significant incidents; and

  o Maintaining staff proficient on current RevIQ Products and/or Services functionality

- In the event our first-level support fails to resolve an incident, we shall partner and/or coordinate with third-party providers, as may be necessary.

- Instructor-led, as well as self-paced, training provided by Wyndham University on the RevIQ Products and/or Services.

**YOUR OBLIGATIONS:**

You shall perform all user-required maintenance procedures specified by the vendor of the specific Hardware components, and obtain required maintenance only from an authorized service provider.

10

**SCHEDULE
TO
MASTER INFORMATION TECHNOLOGY AGREEMENT**

**REVIQ PRODUCTS AND/OR SERVICES**

**ATTACHMENT 3.2**

**RevIQ System Use Restrictions**

.

- In no instance may the output of the RevIQ Products and/or Services be shared with any third parties (other than Service Provider or your Permitted Users).

- Neither you nor your Permitted User may sell, rent, lease, sublicense or otherwise provide access to the RevIQ Products and/or Services to any third parties (other than providing access to Service Provider (including its Affiliates) or your Permitted Users).

- Neither you nor your Permitted User may attempt to disassemble, decompile, reverse engineer, or otherwise attempt to recreate the source code of the RevIQ Products and/or Services.

- Neither you nor your Permitted User may use the RevIQ Products and/or Services to process third party data or as a service provider on behalf of third parties.

- Except to the extent allowed by law, neither you nor your Permitted User may use the RevIQ Products and/or Services or authorize any other party or entity to use the RevIQ Products and/or Services to develop a commercial offering or product directly or indirectly competing with an offering or product from our third-party vendor, IDeaS.

**SCHEDULE**
**TO**
**MASTER INFORMATION TECHNOLOGY AGREEMENT**

**SYNXIS PROPERTY MANAGEMENT**

**ATTACHMENT 4.1 – SynXis Property Hub Fees**

Your Fees are as indicated in the table below, commencing as of the date indicated below, subject to Section 4.1 of the Master Information Technology Agreement:

| Date | Monthly Fee |
|---|---|
| 04/11/2023 | $621.00 |

In certain circumstances we may issue you a written quote with Facility-specific fees that differ from those reflected above. Provided that the quote we issue in writing is signed by you, then in the event of any conflict between this Attachment 4.1 and the quote, the quote shall control.

12

**SCHEDULE
TO
MASTER INFORMATION TECHNOLOGY AGREEMENT**

## <u>ATTACHMENT 5.1</u>

**SYNXIS PROPERTY MANAGEMENT SYSTEM**

**Hardware Minimum Technical Specification
Requirements**

1. Windows 10 Pro Recommended

2. Internet Connection: 4G+.  Recommend 10+Mbps

3. Modern Browser:  Chrome, Edge, Safari

4. 2GB+ Available Disk Space

5. PDF Viewer:  Acrobat, Chrome

6. Screen resolution: set to at least 1024x768

7. Belkin 25' Cat 5 Cable- 3 (one per workstation & printer)

8. 1 Smart 750VA 120USB UPS  (this is your battery backup for your master workstation)

9. 8+ GB of RAM on each Workstation

### <u>REVIQ PRODUCTS AND/OR SERVICES</u>

### <u>Technical and Operational Requirements</u>

1. At the time of activation of the RevIQ Products and/or Services, you must have access to the Internet.

2. At the time of activation of the RevIQ Products and/or Services, you must be operating on a Sabre SynXis CR and Sabre property management system.

3. You must perform nightly financial audits.

4. Permitted User(s) must have access to Okta Single Sign On ("**SSO**") login functionality.

5. Permitted User(s) must have access to the internet via desktop computer.

6. Permitted User(s) must complete specified required training for the RevIQ Products and/or Services.

# EXHIBIT C

## GUARANTY

To induce Super 8 Worldwide, Inc, its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments, will be punctually paid and performed

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee under the Agreement  Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee  We waive notice of amendment of the Agreement  We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement

GUARANTORS

*kentankumar Chaudhari*

Name  Ketan Chaudhari
Address  24287 N  187th Ave , Elkhorn, NE 68022

*Rashmi Samani*

Name  Rashmi Samani
Address  24287 N  187th Ave , Elkhorn, NE 68022

SUP
Q1/19

# EXHIBIT D

# WYNDHAM
## HOTELS & RESORTS

Contracts Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 fax (800) 880-9445

January 21, 2025

**Via Electronic Mail & UPS**
*americinnzoo@gmail.com*

Mr. Ketan B. Chaudhari
Maharaj Bapa, LLC
2920 S 13th Ct
Omaha, NE 68108

**Re:**   **NOTICE OF OPERATIONAL DEFAULT** pursuant to the Franchise Agreement dated June 26, 2019 (the "Agreement") between Maharaj Bapa, LLC ("you" or "your") and Super 8 Worldwide, Inc. ("we," "our" or "us") relating to Super 8® by Wyndham Unit #54314-14882-02 located in Omaha, NE (the "Facility")

Dear Mr. Chaudhari:

We write to give you formal notice that you are in default under the terms of the Agreement. As you are aware, the Agreement obligates you to uphold the goodwill and public image of the Super 8 brand. Any actions that, in our reasonable judgment, could harm or negatively affect the goodwill associated with the Marks or the System will be considered a violation of the Agreement. Please be advised that the arrests for criminal activity that occurred at your AmericInn facility on or about January 8, 2025, and your allowance of such conduct on your property, undoubtedly impacts the goodwill of the Super 8 System.

Section 3.11 of the Agreement states that, "You will use reasonable efforts to protect, maintain and promote the name 'Super 8' or 'Super 8 by Wyndham' and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System." Additionally, we remind you that pursuant to Section 3.2 of the Agreement, you are required to operate the Facility in compliance with all federal, state and local laws, regulations and ordinances as well as System Standards.

As a result of your default, please be advised that we have suspended the Facility's access to our central reservation system. The Facility's access to our central reservation system will remain suspended until your default has been cured to our satisfaction.

Under the terms of the Agreement, you have thirty (30) days to cure your default. At this time, you must immediately respond to us, in writing at the below email address, with any measures being taken to ensure that this type of activity does not occur at the Facility and state your engagement with law enforcement to address any safety and security concerns that may arise at your Facility. We also strongly suggest that you engage with a hotel management company acceptable to us to operate the Facility. If you elect to do so, please deliver to us, in writing, a contract for a bona fide hotel management company for our approval.

If you fail to cure your default within the timeframe permitted, we reserve all rights under the terms of the Agreement, including, but not limited to, the termination of the Agreement and your right to operate in the Super 8 System.

Please be reminded, in accordance with Section 8 of the Agreement you are obligated to defend, indemnify, and hold us harmless from and against any and all claims that may arise. Further should we or any of our



Mr Ketan B. Chaudhari
January 21, 2025
Page 2

affiliates be named as a defendant in any legal action regarding the Facility we will seek from you, and your Guarantors, indemnification from any liability assessed against us and all costs associated with our defense of any such claim.

This Notice does not modify, replace, or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. By copy of this Notice, we are also informing your Guarantors of your default.

We urge you to take this opportunity to resolve your default. If you have any questions regarding your default or how it can be timely cured, please contact me at Dina.DiFranco@wyndham.com or 973-753-6155.

Sincerely,

Dina DiFranco
Senior Manager
Contracts Compliance

cc:     Rashmi Samani (Guarantor) 24287 N. 187th Ave., Elkhorn, NE 68022
        Ketan B. Chaudhari (Guarantor) 24287 N. 187th Ave., Elkhorn, NE 68022
        Shilpan Patel
        Mike Mueller
        Suzanne Fenimore



# EXHIBIT E

**WYNDHAM**
**HOTELS & RESORTS**
Contracts Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 fax (800) 880-9445

March 20, 2025

**VIA ELECTRONIC MAIL AND UPS**
americinnzoo@gmail.com & kenchad@yahoo.com

Mr. Ketan B. Chaudhari
Maharaj Bapa, LLC
2920 S. 13th Court
Omaha, NE 68108

**Re: NOTICE OF TERMINATION** of Franchise Agreement, dated June 26, 2019 (the "Agreement"), between Maharaj Bapa, LLC ("you" or "your") and Super 8 Worldwide, Inc. ("we", "our" or "us") for the Super 8® by Wyndham System Unit #54314-14882-02 located in Omaha, NE (the "Facility")

Dear Mr. Chaudhari:

We write to give you formal notice of the termination of the Franchise granted under the Agreement to operate the Facility as part of the Super 8® System (the "Notice"). This termination is a result of your failure to satisfy your operational and good will obligations under the Agreement, as outlined in our notice dated January 21, 2025. Accordingly, the termination of the Agreement is effective as of today, March 20, 2025 (the "Termination Date").

At this time, we remind you that because the Agreement has terminated, you must perform your post-termination obligations such as the removal of all items that display or refer to the Super 8® brand at the Facility. The de-identification procedures are specified in the enclosure to this Notice. These de-identification procedures must be completed within ten (10) days from the Termination Date.

You must also pay us the full amount of all Recurring Fees and other charges due under the Agreement through the date you complete the de-identification process. We estimate that, as of the date of Termination, you owe us $11,439.57 in Recurring Fees. This amount is described in more detail in the enclosed itemized statement. You also are obligated to pay any invoices we send you after the Termination Date for additional amounts due under the Franchise Agreement and any other agreement with us, within ten (10) days after receipt. Additionally, you must pay us Liquidated Damages of $108,000 as specified in Section 12.1 of the Agreement.

Furthermore, and without limitation, you must continue to honor all obligations to indemnify and provide insurance coverage for us and our affiliate entities for any claims or causes of action arising from any alleged acts or occurrences at the Facility.

Please know that, because the Agreement has terminated, you have also lost the right to continue to use the seamless interface version of your property management system. You must now make arrangements with the software vendor for a new license to use the property management system. Please be advised that due to the termination you will have no functionality from the system. If the Facility has a SynXis system installed and you wish to continue using an independent version of the software, please contact Sabre at 682-605-1000, or at SHSsalesrequest@sabre.com. If the Facility has an Opera system installed and you wish to continue using an independent version of the software, please contact Scott Cochran at 667-786-5519. Further, you will also lose access to additional accounts, such as Oracle Hospitality Integration Platform (OHIP) and Reporting and Analytics (R&A). Please see the attached Opera Cloud Termination –



Mr. Ketan B. Chaudhari
March 20, 2025
Page Two

PMS Best Practices for next steps.  If your property is planning to migrate to another property management system, please contact your provider to expedite the installation.  If you would like to inquire about the data maintained in the system, please contact Hotel Technology Client Support at 506-646-2504 to obtain reporting of that data.

If within the ten (10) day period described above, you do not timely remove the exterior signage which bears the Super 8® name and Marks, we may exercise our rights under the Agreement and send an independent contractor to the Facility to remove all such signage at and around the Facility. The cost of sign removal will be added to your final invoice from us.  If you object to the removal of the signage by our independent contractor, you must notify us within ten (10) days of the Termination Date.

If you do not timely complete each of these post-termination obligations, we will refer this matter to our legal department to ensure that we recover from you all amounts owed and that all of your post-termination obligations to us are performed.

This Notice does not modify, replace or affect any default under the Agreement, or any other default and termination notices, if any, from us or any of our affiliates regarding the Facility. This Notice does not, in any way, limit your obligations under the Agreement.  Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to your Guarantors.

Should you have any questions regarding this matter, please contact Kelly Krug, Vice President of Legal, at (973) 753-6757 or kelly.krug@wyndham.com.

Sincerely,

Suzanne Fenimore
Vice President
Contracts Compliance

Enclosure

cc:     Rashmi Samani (Guarantor) -  2427 N. 187th Ave., Elkhorn, NE 68022
        Ketan B. Chaudhari (as Guarantor) - 2427 N. 187th Ave., Elkhorn, NE 68022
        Onkar N. Sharma, Esq. – Via Email: onkar.sharma@sharmalawgroup.com
        Kelly Krug, Esq.
        Mike Mueller
        Shilpan Patel
        Dina DiFranco
        Dawn Whitley

Maharaj Bapa, LLC
9305 South 145th Street,
Omaha,
NE 68138, United States



**GO GREEN:** <u>PAY VIA WYNPAY</u>
**Access WynPay via Wyndham Community:**
<u>https://community.wyndham.com</u>

Super 8 Worldwide, Inc
22 Sylvan Way
Parsippany, NJ 07054

Payment Terms: 30 Days from date of invoice          Account Number  54314-14882-02-SUP          Statement as of:  20-MAR-2025

| Period | Invoice Date | Invoice Number | Invoice Description | Amount Billed (USD) | Tax | Finance Charges | Amount Applied/ Credited | Adjustment | Total (USD) |
|---|---|---|---|---|---|---|---|---|---|
| OCT-24 | 10/07/2024 | TD3356145 | DIGITAL PFP | 8.18 | 0.00 | 0.00 | 0.00 | 0.00 | 8.18 |
| | | | **Total OCT-24** | **8.18** | **0.00** | **0.00** | **0.00** | **0.00** | **8.18** |
| NOV-24 | 11/06/2024 | TD3363371 | DIGITAL PFP | 57.61 | 0.00 | 0.00 | 0.00 | 0.00 | 57.61 |
| | 11/06/2024 | TM3363371 | MEMBER BENEFIT COMMISSION | 6.84 | 0.00 | 0.00 | 0.00 | 0.00 | 6.84 |
| | 11/30/2024 | 46556110 | Actual-ROYALTY FEE | 1,459.97 | 0.00 | 51.10 | 0.00 | 0.00 | 1,511.07 |
| | 11/30/2024 | 46556111 | Actual-ADVERTISING | 796.35 | 0.00 | 27.87 | 0.00 | 0.00 | 824.22 |
| | 11/30/2024 | 46539065 | CONTINUING EDUCATION FEE | 600.00 | 0.00 | 9.03 | 0.00 | 0.00 | 609.03 |
| | 11/30/2024 | 46541696 | SYNXIS PM SUPPORT | 699.00 | 0.00 | 24.46 | 0.00 | 0.00 | 723.46 |
| | | | **Total NOV-24** | **3,619.77** | **0.00** | **112.46** | **0.00** | **0.00** | **3,732.23** |
| DEC-24 | 12/03/2024 | TD3370585 | DIGITAL PFP | 14.11 | 0.00 | 0.37 | 0.00 | 0.00 | 14.48 |
| | 12/24/2024 | 27149815 | WYNREWARDS 5% INCREASE: 0.50% | 17.44 | 0.00 | 0.40 | 0.00 | 0.00 | 17.84 |
| | 12/24/2024 | 27149728 | WYNDHAM REWARDS 5% | 174.59 | 0.00 | 4.01 | 0.00 | 0.00 | 178.60 |
| | 12/24/2024 | 27145047 | WYNDHAM REWARDS FREE NIGHTS RE | -225.00 | 0.00 | 0.00 | 0.00 | 0.00 | -225.00 |
| | 12/31/2024 | 46588317 | Actual-ROYALTY FEE | 1,197.00 | 0.00 | 23.34 | 0.00 | 0.00 | 1,220.34 |
| | 12/31/2024 | 46588318 | Actual-ADVERTISING | 652.91 | 0.00 | 12.73 | 0.00 | 0.00 | 665.64 |
| | 12/31/2024 | 46573669 | SYNXIS PM SUPPORT | 699.00 | 0.00 | 13.63 | 0.00 | 0.00 | 712.63 |
| | | | **Total DEC-24** | **2,530.05** | **0.00** | **54.48** | **0.00** | **0.00** | **2,584.53** |
| JAN-25 | 01/03/2025 | TD3377822 | DIGITAL PFP | 4.90 | 0.00 | 0.05 | 0.00 | 0.00 | 4.95 |
| | 01/07/2025 | 27150069 | Missed Valid Enrollment Fee | 750.00 | 0.00 | 12.00 | 0.00 | 0.00 | 762.00 |
| | 01/09/2025 | 11301468 | GUEST SATISFACTION CHARGE | 30.00 | 0.00 | 0.23 | 0.00 | 0.00 | 30.23 |
| | 01/09/2025 | 11301853 | GUEST SATISFACTION- WYNREWARDS | 25.00 | 0.00 | 0.19 | 0.00 | 0.00 | 25.19 |
| | 01/21/2025 | 33277428 | GDS INTERNET CONNECTIVITY FEE December 2024 | 171.50 | 0.00 | 1.54 | 0.00 | 0.00 | 173.04 |
| | 01/27/2025 | 27154777 | WYNDHAM REWARDS 5% | 421.22 | 0.00 | 2.53 | 0.00 | 0.00 | 423.75 |
| | 01/27/2025 | 27154776 | WYNREWARDS 5% INCREASE: 0.50% | 48.02 | 0.00 | 0.29 | 0.00 | 0.00 | 48.31 |
| | 01/27/2025 | 27152372 | WYNDHAM REWARDS FREE NIGHTS RE | -225.00 | 0.00 | 0.00 | 0.00 | 0.00 | -225.00 |
| | 01/31/2025 | 46618114 | Actual-ADVERTISING | 447.41 | 0.00 | 1.79 | 0.00 | 0.00 | 449.20 |
| | 01/31/2025 | 46618112 | Actual-ROYALTY FEE | 820.25 | 0.00 | 3.28 | 0.00 | 0.00 | 823.53 |
| | | | **Total JAN-25** | **2,493.30** | **0.00** | **21.90** | **0.00** | **0.00** | **2,515.20** |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| FEB-25 | 02/04/2025 | 27155228 | WR MISSING STAY ADMIN FEE | 50.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50.00 |
| | 02/04/2025 | TD3384969 | DIGITAL PFP | 4.41 | 0.00 | 0.00 | 0.00 | 0.00 | 4.41 |
| | 02/04/2025 | TM3384969 | MEMBER BENEFIT COMMISSION | 6.30 | 0.00 | 0.00 | 0.00 | 0.00 | 6.30 |
| | 02/07/2025 | 33286644 | AHLA MEMBERSHIP FEE | 162.00 | 0.00 | 0.00 | 0.00 | 0.00 | 162.00 |
| | 02/07/2025 | 11306939 | GUEST SATISFACTION CHARGE | 30.00 | 0.00 | 0.00 | 0.00 | 0.00 | 30.00 |
| | 02/25/2025 | 27160061 | WYNREWARDS 5% INCREASE: 0.50% | 9.56 | 0.00 | 0.00 | 0.00 | 0.00 | 9.56 |
| | 02/25/2025 | 27155715 | WYNDHAM REWARDS 5% | 95.92 | 0.00 | 0.00 | 0.00 | 0.00 | 95.92 |
| | 02/26/2025 | 33301262 | GDS INTERNET CONNECTIVITY FEE January 2025 | 49.00 | 0.00 | 0.00 | 0.00 | 0.00 | 49.00 |
| | 02/28/2025 | 46659895 | Actual-ROYALTY FEE | 500.33 | 0.00 | 0.00 | 0.00 | 0.00 | 500.33 |
| | 02/28/2025 | 46659894 | Actual-ADVERTISING | 272.91 | 0.00 | 0.00 | 0.00 | 0.00 | 272.91 |
| | | | **Total FEB-25** | **1,180.43** | **0.00** | **0.00** | **0.00** | **0.00** | **1,180.43** |
| MAR-25 | 03/01/2025 | 33315800 | SYNXIS PM SUPPORT Correction - Otrx 46630821 | 583.00 | 0.00 | 0.00 | 0.00 | 0.00 | 583.00 |
| | 03/05/2025 | 33330369 | SYNXIS PM SUPPORT Correction - Jan 2025 - Otrx 46601584 | 583.00 | 0.00 | 0.00 | 0.00 | 0.00 | 583.00 |
| | 03/05/2025 | 33334549 | SYNXIS ADDITIONAL OFFERINGS Correction - Jan 2025 - Otrx 46601584 | 116.00 | 0.00 | 0.00 | 0.00 | 0.00 | 116.00 |
| | 03/06/2025 | 33340878 | SYNXIS ADDITIONAL OFFERINGS 25-Feb | 116.00 | 0.00 | 0.00 | 0.00 | 0.00 | 116.00 |
| | 03/07/2025 | 11309875 | GUEST SATISFACTION CHARGE | 15.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15.00 |
| | 03/13/2025 | 33364925 | GOVERNMENT RFP PROGRAM | 6.00 | 0.00 | 0.00 | 0.00 | 0.00 | 6.00 |
| | | | **Total MAR-25** | **1,419.00** | **0.00** | **0.00** | **0.00** | **0.00** | **1,419.00** |
| | | | **Total Outstanding:** | **11,250.73** | **0.00** | **188.84** | **0.00** | **0.00** | **11,439.57** |



Super 8 Worldwide, Inc
22 Sylvan Way
Parsippany, NJ 07054

**PAYMENT OPTIONS**

**BY WIRE TRANSFER**: Please ensure all transfers costs are settled by yourselves. Please quote the invoice and account number with payment and transfer to:

| | | |
|---|---|---|
| Bank | : | Bank of America, N.A. |
| Branch Address | : | 15020 Collections Center Drive Chicago, IL 60693 |
| Account Name | : | Super 8 Worldwide, Inc |
| Bank Account Number | : | |
| ABA | : | |
| Swift Code | : | |

**REMIT CHECKS TO:**

Super 8 Worldwide, Inc
15020 Collections Center Drive
Chicago, IL 60693

**GO GREEN:** **PAY VIA WYNPAY**
**Access WynPay via Wyndham Community:**
**https://community.wyndham.com**

**Additional Information:**

Thank you in advance for your prompt payment and continued business
Please note accrual invoices on your account are estimates and can't be paid until actual revenues are reported
Please ensure you promptly submit your actual revenues and rooms sold in Wynpay

**Contact information:**

For supporting invoice details please visit WynPay and/or Wyndham Community.  For questions please call 1-855-849-3487 or email Financial.Services@wyndham.com

| Billing Glossary | |
| --- | --- |
| **Catcode Description** | **Long Description** |
| ADVERTISING | Recurring fee for the advertising and marketing activities of the system, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| AHLA MEMBERSHIP FEE | Annual fee for American Hotel & Lodging Association (AHLA) membership. Prior to this invoice you would have received a communication with the option to opt-out of the charge before a set deadline. For questions please contact the Operations Support Desk at 855-849-3487 |
| CONTINUING EDUCATION FEE | Annual continuing education fee as outlined in your Franchise Disclosure Document. The fee provides access to the Wyndham University training system, training content, and other training opportunities. In Wyndham University, you can also access learning journeys for other hotels roles for added develop into other responsibilities. For questions please contact WyndhamU@wyndham.com. |
| DIGITAL PFP | Commissions related to bookings that are part of the digital pay for performance (DPFP) program. The DPFP is a program designed to reinvest funds into our digital media program to deliver direct bookings to our franchisees. DPFP-eligible channels include Paid Search, Meta, Feeds, Display, Local, and Facebook Retargeting. Please Note: The DPFP commission is not charged on every digital media driven booking. For example, bookings through select member benefits programs (e.g, AAA and AARP) as well as bookings by Platinum, Diamond, and Titanium rewards members, are not charged, For questions please contact central.commissions@wyndham.com. |
| GDS INTERNET CONNECTIVITY FEE | GDS & Internet Connectivity Fees are charged per consumed booking based on the fees outlined in your agreement or subsequent communication. No GDS and internet connectivity fees are due on cancelled or no-show reservations provided they are updated in the reservation system. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Finance" category. For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487 |
| GOVERNMENT RFP PROGRAM | Annual fee for participating in government RFP program. For questions related to this charge, please contact whg_gso_coe@wyndham.com |
| GUEST SATISFACTION CHARGE | Fee for the cost of Wyndham Guest Response team responding to negative Medallia reviews or for not resolving a customer complaint within 3 days and Customer Care resolved the complaint on behalf of the property or for an approved best rate guarantee claim. Backup for the invoice can be obtained at Wyndham Community-> Hotel Management -> Reports and filter for "Customer Care" category. For questions on the invoice please contact the Operations Support Desk at 1-855-849-3487 or by emailing GM.Hotline@wyndham.com |
| GUEST SATISFACTION-WYNREWARDS | Fee for Customer Care to resolve a guest complaint on behalf of the property and provide reimbursement to the guest in the form of Wyndham Rewards points. The invoice is the cost of the Wyndham Rewards points. Supporting details for this invoice are located in Wynpay. For questions on the invoice please contact the Operations Support Desk at 1-855-849-3487, input the first letter of your Brand then then select option 6 or by emailing GM.Hotline@wyndham.com |
| MEMBER BENEFIT COMMISSION | Commissions related to Global Sales member benefits program. The Member Benefits Program establishes partnerships with member loyalty and affinity based organizations by providing those organizations' with a proprietary discount. Accounts include but are not limited to AARP, American Legion, Wyndham Destinations, American Farm Bureaus to name a few. This program is used to help keep WHR top of mind with these organizations in order to drive revenue through Wyndham Direct channels. Backup for this invoice can be found at Wynpay and/or at Wyndham Community-> Hotel Management -> Reports -> filter for "Finance". For questions related to this invoice please contact central.commissions@wyndham.com or the Operations Support Desk at 855-849-3487. |
| Missed Valid Enrollment Fee | The Missed Valid Enrollment Fee is charged when your property enrolls 33% or less than your Quarterly Valid Enrollment Target for two consecutive quarters. Backup for this invoice can be found at the following location: Wyndham Community > Quick Links > Wyndham Rewards eDesk > Loyalty Fee Discount/Increase Detail Report. For questions, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| ROYALTY FEE | Recurring fee for the use of the Marks and System, as outlined in your agreement. For questions on this invoice please contact the Operations Support Desk at 855-849-3487 or OSD@wyndham.com |
| SYNXIS ADDITIONAL OFFERINGS | A fee covering the cost of licenses for additional tools (e.g., RevIQ and OTAI) as noted within your Master Information Technology Agreement. For questions on this invoice please contact ITBilling@wyndham.com or the Operations Support Desk at 855-849-3487 or OSD@wyndham.com (EMEA region: operations.emea@wyndham.com) |
| SYNXIS PM SUPPORT | A fee for HTCS first level support services as detailed in your property management system agreement. For questions on this invoice please contact ITBilling@wyndham.com or the Operations Support Desk at 855-849-3487 or OSD@wyndham.com (EMEA region: operations.emea@wyndham.com) |
| WR MISSING STAY ADMIN FEE | Fee imposed if your property fails to properly post a Member's Earning Stay within 10 days of the Member's check-out date and Member Services must resolve the Member's request for their missing points, you will be subject to a Missing Stay Administration Fee. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS 5% | Wyndham Rewards Loyalty Program assesses a 5% fee based on members' qualified stays and discounted nights using Points + Cash. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNDHAM REWARDS FREE NIGHTS REIMB | Reimbursement for actualized free night stay. Reimbursement is based on your hotel's occupancy and ADR of the day the Free Night is consumed. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to the credit/charge, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com |
| WYNREWARDS 5% INCREASE: 0.50% | The Wyndham Rewards Loyalty Program assesses a 5% fee on all nights for which member earn points. This Increase is for hotels that missed their Quarterly Valid Enrollment Target, achieving 66% or less of their target during the prior quarter. This means the net Loyalty Program Charge for this quarter is 5.50%. Backup for this invoice can be found at the following location: Wyndham Community-> Hotel Management -> Reports and filter for "Loyalty" category. For questions related to this fee, please contact Wyndham Rewards Billing and Reimbursement at 1-866-272-7653 or by email WR.billing@wyndham.com. |

## DE-IDENTIFICATION PROCEDURES

**You must complete each of the following within 10 days after the Termination Date:**

1.     Remove, replace or cover with an opaque cover the primary Facility signage and all other exterior signage bearing the Super 8 Marks.

2.     Remove all interior signage that contains Super 8 Marks.

3.     Change advertising billboards to remove Super 8 Marks, including any department of transportation or other highway signage.

4.     Stop answering Facility telephone as a Super 8 facility.

5.     Remove Super 8 name and Marks from any domain name, advertising and brochures.

6.     Return to us or destroy all confidential operations and training manuals.

7.     Remove the Super 8 name and Marks from the following items:

   - Guestroom supplies including door signage, ice buckets, cups etc.
   - Bathroom supplies including soap, shampoo, conditioner, etc.
   - Business cards and letterhead
   - Registration cards, folios, guest receipts, including electronic copies
   - Guestroom keys
   - Uniforms and name badges

8.     Paint over or remove any distinctive Super 8 trade dress, paint schemes or architectural features.

9.     Remove Super 8 name from the Facility's listing on TripAdvisor or any other online traveler review site.

10.    It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Super 8 facility.

11.    We will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.